# IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

FLORIDA PREBORN RESCUE, INC.,
ALLEN TUTHILL, ANTONIETTE M. MIGLIORE,
SCOTT MAHURIN, JUDITH GOLDSBERRY,
*Plaintiffs-Appellants,*

v.

CITY OF CLEARWATER, FLORIDA,
*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA 8:23-cv-01173-MSS-AAS

## BRIEF OF APPELLEE

Luke Lirot, Esq
Luke Charles Lirot P.A.
Florida Bar Number
2240 Belleair Road, Suite 190
Phone (727) 536-2100
Fax (727) 536-2110
Luke2@lirotlaw.com
team@lirotlaw.com
*Counsel for Appellee*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1, Appellee's certify the following is a complete list of interested persons:

1. Allbritton, David – Councilmember for the City of Clearwater, Florida

2. Aungst Sr., Brian J. – Mayor for the City of Clearwater, Florida

3. Beckman, Kathleen – Councilmember for the City of Clearwater, Florida

4. Bird, R. Quincy – Counsel for Appellants/Plaintiffs

5. Brooks, Brennan Tyler – Counsel for Appellants/Plaintiffs

6. Bunker, Mark – Councilmember for the City of Clearwater, Florida

7. Christopher, Donald – Counsel for Appellants/Plaintiffs

8. City of Clearwater, Florida – Appellee

9. Florida Preborn Rescue, Inc. – Appellant

10. Gandy, Eric – Police Chief for the City of Clearwater, Florida

11. Goldsberry, Judith – Appellant

12. Heffron, Matt – Counsel Appellants/Plaintiffs

13. Isabel, Melissa – Counsel for Appellee (City Attorney)

14. Lirot, Luke Charles – Counsel for Appellee

15. Luke Charles Lirot, PA – Law Firm for Appellee

16. McEwan, Eric – Officer/Director for Florida Preborn Rescue, Inc.

17. McHale, Michael – Counsel for Appellants/Plaintiffs

18. Mahurin, Scott J. – Appellant

19. Margolis, David – City Attorney for the City of Clearwater, Florida

20. Mannix, Joan – Counsel for Appellants/Plaintiffs

21. Marshick, Timothy – Officer/Director for Florida Preborn Rescue, Inc.

22. Migliore, Antoniette – Appellant

23. O'Donnell Christopher LLP – Law Firm for Appellants/Plaintiffs

24. O'Donnell, Robert – Counsel for Appellants/Plaintiffs

25. Poirrier, Jennifer – City Manager for the City of Clearwater, Florida

26. Ricks, Rachel – Counsel for Appellee

27. Sansone, Hon. Amanda – U.S. Magistrate Judge (M.D. Fla.)

28. Scriven, Hon. Mary – U.S. District Judge (M.D. Fla.)

29. Teixeira, Lina – Councilmember for the City of Clearwater, Florida

30. Theophilopoulos, Gerasimos "Jerry"    – Counsel for Appellants/Plaintiffs

31. Theophilopoulos Law – Law Firm for Appellants/Plaintiffs

32. Thomas More Society – Law Firm for Appellants/Plaintiffs

33. Tuthill, Allen – Appellant

34. Weber, Crabb & Wein, P.A. –    Law Firm for Appellants/Plaintiffs

No corporation that is a party to this proceeding has any parent corporation nor does any corporation in this proceeding have any publicly held corporation that owns 10% or more of its stock. No publicly traded company or corporation has an interest in the outcome of this case or appeal.


Date: February 2, 2024          /s/Luke Lirot
                                Luke Lirot
                                *Counsel for Appellee*

# STATEMENT REGARDING ORAL ARGUMENT

This appeal addresses First Amendment questions about a "safety zone" enacted by the Appellee, City of Clearwater, Florida, ("City"). Based on repeated concern with pedestrians and/or "protestors" blocking, crossing, or languishing in the driveway of the Bread and Roses Women's Clinic (the "Clinic"), the City adopted an "Ordinance" which requires *all* individuals to maintain a distance of 5-feet outside the North and South side of the driveway. The Ordinance was adopted because of safety concerns caused by the repeated obstruction of vehicular ingress and egress into the Clinic, particularly vehicular safety issues on the days the Clinic was open, including Tuesdays, Thursdays, and Saturdays.

Plaintiffs-Appellants ("Plaintiffs") claim to be "sidewalk counselors," and asserted they were present outside the Clinic only on Tuesdays and Thursdays, and asserted they desired only to peacefully attempt to converse with, and distribute leaflets to, prospective patients of the Clinic. Even though the Ordinance has not limited their ability to be seen, heard, or pass out leaflets in the most common way, by offering them to people outside this minimal "safety zone," or walking over to them in areas other than the *de minimis* safety zone created by the Ordinance. The City's position is that Plaintiffs, unhappy about *any* regulation that they feel affects their unfettered ability to do as they wish in this context, exaggerate their claim that the "safety zone" has made it impossible to converse in "sidewalk counseling

voices," hand out leaflets, or otherwise effectively spread their "message." Exposing this exaggeration and fully addressing the intricate First Amendment arguments at issue in this matter would be made clearer with an Oral Argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT…………………………………………………… ii

STATEMENT REGARDING ORAL ARGUMENT……………………………... v

TABLE OF CONTENTS……………………………………………………... vii

TABLE OF CITATIONS……………………………………………….…..... ix

INTRODUCTION ..................................................................................... 1

STATEMENT OF ISSUES ........................................................................ 2

STATEMENT OF CASE ........................................................................... 3

    I.    The Clearwater Safety Zone Ordinance. ............................................. 3

    II.    The Evidence Presented on Plaintiffs' Motion For Preliminary Injunctive Relief. ....................................................................... 5

        A.    Plaintiffs Are Peaceful, Law-Abiding Sidewalk Counselors .... 5

        B.    The Impact of The Ordinance on Plaintiffs' Speech ………….. 6

        C.    The City's Justifications For The Ordinance. ........................... 8

            1.    Conditions at The Clinic on Tuesdays And Thursdays.. 10

            2.    Police Activity At The Clinic On Saturdays.................. 10

            3.    Traffic-Related Issues. .................................................. 11

IV.    Standard of Review. ...................................................................... 12

SUMMARY OF ARGUMENT ................................................................. 13

ARGUMENT ........................................................................................... 15

I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE THE ORDINANCE DOES NOT VIOLATE INTERMEDIATE SCRUTINY. ....................................................................................... 16

    A.    Plaintiffs' Speech is Protected by the First Amendment, but that Does not Insulate such Speech from Content Neutral Regulations that are Clearly Designed to Protect the Public Safety ....................................................... 18

B.    The City's Ordinance is narrowly tailored ......................................... 21

       1.    The Ordinance Does Not Burden Substantially More Speech than Necessary ................................................................... 22

       2.    The City has Shown that it Seriously Sought to Consider Less Restrictive Means to Deal with the Issues the Ordinance was Adopted to Address ................................................................. 31

C.    The Ordinance Leaves Open Ample Alternatives ........................... 38

D.    Sisters For Life is Significantly Different form this Case ................ 41

E.    This Case is Significantly Different from Numerous Federal Court Cases that have Recently Invalidated Bans on Street Solicitation and Leafleting ....................................................................... 44

II.    Plaintiffs Do Not Satisfy the Remaining Factors for a Preliminary Injunction. ........................................................................... 50

    A.    Irreparable Harm. ......................................................... 50

    B.    Balance of Harms and Public Interest. ............................... 51

CONCLUSION ....................................................................... 51

CERTIFICATE OF COMPLIANCE................................................ 53

CERTIFICATE OF SERVICE...................................................... 53

# TABLE OF CITATIONS

**Cases**                                                                        **Page**

*Allentown Women's Ctr., Inc. v. Sulpizio,*
403 F.Supp.3d 461 (E.D. Pa. 2019) ...................................................................... 36

*Allied Veterans of the World, Inc., v. Seminole,*
D.C. Docket No. 6:11-cv-00155-JA-GJK, No. 11-12185, at 3 (11th Cir. Mar 21, 2012) ………………………………………………………………………….. 12

*Am. for Prosperity Found. v. Bonta,*
*141 S. Ct. 2373, 2384–85, 210 L.Ed.2d 716 (2021)* ............................................ 31

*Bischoff v. Fla.,*
242 F. Supp. 2d 1226 (M.D. Fla. 2003) ........................................................... 35, 48

*Brewer v. Albuquerque,*
18 F.4th 1205 (10th Cir. 2021) ............................................................................. 45

*Bruni v. City of Pittsburgh,*
941 F.3d 73 (3d Cir. 2019) ....................................................... 4, 16, 22, 32, 37, 38

*Clark v. Community for Creative Non–Violence,*
468 U.S. 288, 293 (1984) ………………………………………………………….. 19

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
657 F.3d 936, 941 (9th Cir. 2011) ………………………………………………... 47

*Cutting v. City of Portland,*
802 F.3d 79 (1st Cir. 2015) ………………………………………………………… 46

*Daniel v. City of Tampa, Florida,*
38 F.3d 546, 550 (11th Cir. 1994) ………………………………………………... 39

*Dombrowski v. Pfister,*
380 U.S. 479, 487 (1965) ………………………………………………………….. 50

*Dream Defenders v. Desantis,*
553 F. Supp. 3d 1052, 1098 (N.D. Fla. 2021) …………………………………… 35

*Elrod v. Burns,*
427 U.S. 347, 373, (1976) …………………………………………………… 50

*Forsyth Cnty. v. U.S. Army Corps of Eng'rs,*
633 F.3d 1032, 1039 (11th Cir. 2011) ……………………………………… 12

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,*
452 U.S. 640, 647 (1981) …………………………………………………….. 38

*Hill v. Colorado,*
530 U.S. 703, 715 (2000) ………………………………………………… 19, 33

*Hohe v. Casey,*
868 F.2d 69, 72–73 (3d Cir.1989) ………………………………………….. 50

*KH Outdoor, LLC v. City of Trussville,*
458 F.3d 1261, 1272 (11th Cir. App. 2006) …………………………………… 50

*Lucero v. Trosch,*
121 F.3d 591 (11th Cir. 1997) ……………………………………………… 36

*Medtronic, Inc. v. Lohr,*
518 U.S. 470, 475 (1996) …………………………………………………….. 19

*McCraw v. City of Okla.,*
973 F.3d 1057 (10th Cir. 2020) …………………………………….. 40, 48, 49

*McCullen v. Coakley,*
134 S. Ct. 2518, 573 U.S. 464 (2014) ………... 1, 16, 17, 18, 22, 23, 27, 32, 35, 47

*Moms for Liberty v. Brevard Public Schools,*
582 F.Supp.3d 1214, 1218 (M.D. Fla. 2022) ………………………………… 16

*Munaf v. Geren,*
553 U.S. 674, 689 (2008) ………………………………………………….. 15

*NAACP v. Alabama ,*
357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) ……………………………. 35

*Nationalist Movement v. City of Cumming, Ga.,*
92 F.3d 1135, 1140 (11th Cir. 1996) …………………………………………….. 39

*Navy Seal 1 v. Austin,*
599 F.Supp.3d 1233, 1242 (FLA. M.D. 2022) …………………………………... 50

*Northeastern Florida Chapter of Ass'n of General Contractors of America v. City of Jacksonville, Florida,* 896 F.2D 1283, 1285 (11th Cir. 1990) ………………... 50

*Perry Educ. Assoc. v. Perry Local Educators' Assoc.,*
460 U.S. 37, 45 (1983) …………………………………………………….. 18

*Pittman v. Cole,*
267 F.3d 1269, 1292 (11th Cir. 2001) …………………………………………… 16

*Pompano Horse Club v. State,*
93 Fla. 415, 441 (1927) ……………………………………………………... 36

*Revette v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers,*
740 F.2d 892, 893 (11th Cir. 1984) ………………………………………… 13

*Reynolds v. Middleton,*
779 F.3d 222 (4th Cir. 2015) ……………………………………………………... 47

*Schenck v. Pro-Choice Network of Western N.Y.,*
519 U.S. 357, 374 (1997) ……………………………………………………... 23

*Schneider v. State of New Jersey, Town of Irvington,*
308 U.S. 147, 60 S.Ct. 146 (1939) …………………………………………….. 44

*Sheets v. City of Punta Gorda, Florida,*
415 F.Supp.3d 1115, 1121 (M.D. Fla. 2019) ………………………………... 15, 16

*Sisters for Life, Inc., v. Louisville-Jefferson County, KY,*
56 F.4th 400 (6th Cir. 2022) ……………………………… 1, 14, 15, 18, 41, 42, 43

*Siegel v. LePore,*
234 F.3d 1163, 1176 (11th Cir. 2000) …………………………………….. 16, 50

*Snook v. Trust Co. of Georgia Bank of Savannah, N.A.,*
909 F.2d 480, 486 (11th Cir.1990) ………………………………………… 50

*Turco v. City of Englewood,*
No. 2:15-cv-03008, 2017 WL 5479509, (D.N.J. Nov. 14, 2017) ……………... 32

*Ward v. Rock Against Racism,*
491 U.S. 781, 789 (1989) …………………………………… 16, 18, 19, 22, 31, 36

*Weinberg v. City of Chicago,*
310 F.3d 1029, 1041 (7th Cir. 2002) …………………………………… 40, 41

**Statutes**

18 U.S.C. §248(c)(1)(A) ..................................................................... 36, 42


Clearwater City Code

§28.10 ................................................................................................ 3, 4

§28.10(2) ............................................................................................ 5


Fla. Stat.

§316.2055 (1976) .............................................................................. 48

Fla. Stat. Ann.

§316.2045 (2021) ................................................................ 12, 14, 34, 35

§316.2045(1)(a)(1) ...................................................................... 34

## INTRODUCTION

This case concerns the City of Clearwater's ("City") enactment of a "safety zone" on the North and South Side of the Bread and Roses Woman's Health Center's (the "Clinic") Driveway, in order to limit the amount of vehicular safety issues that were found to happen at the Clinic, primarily on Tuesdays, Thursdays, and Saturdays.

Plaintiffs-Appellants ("Plaintiffs") describe themselves as pro-life "sidewalk counselors" who seek only to distribute free pro-life literature and engage in personal, consensual, and caring conversations with women who may be contemplating abortion. Although Plaintiffs claim that the "safety zone" has substantially burdened their right to free speech, the Ordinance still allows the Plaintiffs to be seen, heard, and to distribute literature as effectively as they had before the Ordinance.

The Plaintiffs try to claim that the similarities between other Federal decisions, cited below, establish the unconstitutionality of the Ordinance. To the contrary, a close examination of the facts of these Federal decisions, the true scope of the Ordinance, and the evidence presented, show that this case is substantially different than the scope of the legislation challenged in *McCullen v. Coakley*, 134 S. Ct. 2518, 189 L. Ed. 2d 502, 573 U.S. 464 (2014), *Sisters for Life, Inc., v. Louisville-*

*Jefferson County, KY, 56 F.4th 400 (6th Cir. 2022)*, and the other much broader types of legislation at issue in those cases.

The primary issue in this case is based on the very unique characteristics of the property in question, and the fact that the "5-foot vehicle safety zone" is just that, a "vehicle safety zone," made necessary by opponents to the Clinic "repeatedly crossing the driveway of the health center and impeding ingress and egress of vehicle traffic and getting within close proximity of driving cars with the intent to frighten and intimidate the vehicle occupants," as established as the basis for the adoption of the Ordinance.

The City's position is that it has created a narrowly tailored Ordinance that has been shown to both "advance" the vehicular safety issues it was adopted for, while also leaving open ample alternatives for communication. This Ordnance has not substantially burdened any of the Plaintiffs' speech. Accordingly, this Court should affirm the District Court's Order Denying the Plaintiffs' Amended Time-Sensitive Motion for Preliminary Injunction and Memorandum of Law ("Motion for Preliminary Injunction") (ECF Doc. 16).

## STATEMENT OF ISSUES

1. Whether the District Court erred in holding that Plaintiffs are not likely to succeed on the merits that the Ordinance violates their First Amendment rights, when the City demonstrated that the Ordinance was narrowly tailored to its asserted

significant interests, and left open ample alternative means of communication for Plaintiffs' sidewalk counseling speech.

2.      Whether Plaintiffs are suffering irreparable harm, and whether a preliminary injunction is consistent with the balance of equities and the public interest when it was shown that any "restrictions" imposed by the Ordinance were *de minimis*, and the Ordinance had dramatically improved the safety threats that were rampant before the adoption of the Ordinance.

## STATEMENT OF THE CASE

**I.    The Clearwater Safety Zone Ordinance.**

On March 16, 2023, the City adopted Ordinance No. 9665 – 23:

> An ordinance of the City of Clearwater Florida. Relating to Medical Clinic Safety; Streets, Sidewalks, Other Public Places, Section -28.10; Establishing a Vehicular Safety Zone, Creating Civil Penalties, and Describing Citation Procedures; Providing an Effective Date.

(Doc. 16-5 at 1)[1].

The legislative predicate of the Ordinance was "content neutral" and showed it was adopted simply to advance public safety: "The police department has observed protestors *repeatedly crossing the driveway of the health center and impeding ingress and egress of vehicle traffic* and getting within close proximity of driving cars with the intent to frighten and intimidate the vehicle occupants." (Doc. 44-1 at

---

[1] The Citations utilized in this Brief are the same as those used the Appellants' Citation's in their Appellants' Brief.

1). Clearly, the City had substantial evidence to support the adoption of an ordinance designed simply to protect public safety in a content neutral and remarkably limited fashion.

Based on these safety concerns, the City adopted the Ordinance (codified as Section 28.10 of the City of Clearwater Code), to "establish a 5-foot vehicle safety zone that will protect the public in a way that allows for citizens to exercise free speech and for citizens to safely ingress and egress the health center. The vehicle safety zone proposed is a 5-foot Safety that will extend north and south of the concrete driveway. The vehicle safety zone would be in place Monday through Saturday, from 7:00 A.M. to 6:00 P.M." (Doc. 16-5 at 2).

In the adoption of the Ordinance, the City included a site-plan and aerial map of the "5-foot vehicle safety zone" (Doc. 16-5 at 5), as well as a summary of Communication Center Data (Doc. 26-5 at 11-12), describing Police "calls for service" and Police presence from January 8, 2022, through January 7, 2023, reflecting the extensive safety threats occurring at the Clinic. Also presented were photographs of the Clinic showing the small area addressed by the Ordinance, as well as a series of photographs and videos showing the conduct deemed of concern. (Doc. 44-1 at 13-17).

In considering the adoption of the Ordinance, the City specifically referred to the "content-neutral safety zone" in *Bruni v. City of Pittsburgh*, 941 F. 3d 73 (3rd

Cir. 2019) (cert. den., 141 S.Ct. 578)," which "prohibited any person from knowingly congregating, patrolling, picketing, or demonstrating within 15 feet of health care facilities." (Doc. 16-5 at 2).

The Ordinance exempts specified classes of people, including "police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business or authorized security personnel employees or agents of the hospital, medical office or Clinic engaged in assisting patients and other persons to enter or exit the Clinic," who are permitted to enter and occupy the area of the driveway from which all others are prohibited. (Doc.16-5 at 2-3; Doc.42-2; City Code §28.10(2)).

## II. The Evidence Presented on Plaintiffs' Motion For Preliminary Injunctive Relief.

### A. Plaintiffs as Sidewalk Counselors

At the evidentiary hearing on the Motion for a Preliminary Injunction, most of the Plaintiffs testified. Scott Mahurin, the director of Plaintiff, Florida Preborn Rescue, Inc. ("FPR"), testified that FPR individuals stand at the edge of the sidewalk and wave at the cars entering the Clinic through the driveway. Most of the people that the FPR individuals engaged with would park at the Clinic and then walk over to one of the FPR individuals. (Tr. 43 at 37:25-38:7).

Antoniette Migliore, a member of FPR, testified that, pre-Ordinance, when she saw a vehicle turn into the driveway, she would great them, say hello to them

and smile, and then, once into the parking lot, she would say "I have information that you may find helpful." If they would come out of their car, she would invite them to come over, and would then say, "do you mind stepping over here because I'm sorry, but I can't walk over there, I'm not allowed to." (Tr. 43 at 104:21-105:8).

The Clinic performs abortions on Tuesdays, Thursdays, and Saturdays. (Tr. 43 at 63:4-5). None of the FPR volunteers go to the Clinic on Saturdays because there are too many people, numerous more vocal protestors, and it was "too loud" to do sidewalk counseling on those days. Instead, the FPR volunteers would go on Tuesdays and Thursdays, when there were fewer people and it was quieter. (Tr. 43 at 62-63, 77, 93).

**B.    The Impact of The Ordinance on Plaintiffs' Speech.**

Before the Ordinance, as cars entered the driveway into the Clinic parking lot, FPR volunteers stood at the edge of the sidewalk and waved at the cars entering the Clinic through the driveway. Most of the people that the Plaintiffs engaged with would park at the Clinic and, if interested,  would then walk over to one of the Plaintiffs and receive the leaflets they offered. (Tr. 43 at 37:17-38:7).

Before the Ordinance, Plaintiff Mahurin stated that most vehicles who pulled into the Clinic driveway would have their windows up and air conditioning on. (Tr. 43 at 55:7-12). Mr. Mahurin testified that, before the Ordinance, handing a leaflet to a vehicle from the sidewalk was less likely than having an actual conversation. (Tr.

43 at 59:23-60:4). Further, Mr. Mahurin testified that a person in the driveway without a sign would block the view from someone driving a vehicle. (Tr. 43 at 57:1-6).

Plaintiff Tuthill testified that he handed out 50 to 60 leaflets before the Ordinance. (Tr. 43 at 65:9-12). Mr. Tuthill testified that the 60 leaflets he gave out were all to people that parked and came up to Mr. Tuthill. (Tr. 43 at 66:11-15). Further, Mr. Tuthill testified that if he was to wave patients down and they were interested in a leaflet, nothing in the Ordinance would prohibit patients from walking up to Mr. Tuthill to get a leaflet from him. (Tr. 43 at 87:16-21). Mr. Tuthill testified that, with the safety zone in place, Mr. Tuthill did not try to flag them down to hand out leaflets. (Tr. 43 at 87:2-7).

The Plaintiffs argued that the safety zone, combined with the Clinic "escorts" whom the Plaintiffs accused of carrying umbrellas to block out the FPR volunteers, interfere with the FPR volunteers' ability to make eye contact. (Tr. at 50, 54-55). Plaintiffs asserted that this *de minimis* 5-foot safety zone required them to raise their voices if they wanted to communicate verbally with people going into the Clinic, which they asserted negatively impacted their ability to effectively convey a "caring and loving message." (Tr. at 102-103).

### C. The City's Justifications for The Ordinance.

To show the absence of any limitation on Plaintiffs' expression and further establish the safety concerns underlying the Ordinance, the City presented the testimony of City of Clearwater Police Officers Stephen Wannos, Lauren Josey-Filer, and Jessica Dylla.

Lieutenant Wannos, Police District Commander for the District in which the Clinic is located, testified that the depictions from the police videos (presented to the District Court) showed congestion in the driveway, showed numerous pedestrians that were impairing the vision of the drivers of the vehicles, (Tr. 43 at 139:8-22), showed pedestrians acting as barriers between the vehicles and other individuals, (Tr. 43 at 141:12-22), and fully depicted the dangerous conditions *before* the Ordinance, These videos showed conduct making it both difficult and dangerous for the occupants and drivers of the vehicles to safely ingress and egress, as well as dangerous for the individuals standing in the driveway. (Tr. 43 at 143:13-23). Additionally, Lt. Wannos testified that individuals would stand by a passenger or a driver's side window, with their large signs, would impair the drivers' ability to see and to safely operate a vehicle. (Tr. 43 at 153:14-23). Lt. Wannos testified that the events at he Clinic required him to be called on Tuesdays and Thursdays, including the Tuesday right before the Preliminary Injunction hearing, held on September 21, 2023. (Tr. 43 at 155:25-156:6), showing that these asserted "quiet times" were not.

Lt. Wannos further testified that, after the Ordinance was adopted, the number of individuals who would continue to stay, enter, or remain within that safety zone had declined significantly. (Tr.43 at 152:7-153:13). Lt. Wannos testified that the safety zone has drastically improved the safety of the pedestrians, the protesters, and those coming and going from the Clinic, as well as everybody on the roadway. (Tr. 43 at 152:7-24).

Officer Josey-filer testified that, before the Ordinance, she observed people approaching vehicles as they tried to enter and exit, holding signs, blocking the view of vehicles trying to exit, and trying to speak to those inside the vehicles, which limited the driver's ability to safely operate their vehicles. (Tr. 43 at 168:10-13). Further. Officer Josey-Filer testified that, after the Ordinance, she observed improvement of these issues, including vehicles being able to come in without having to avoid people in the driveway obstructing their entry into the Clinic. She stated that even when people go to leave, they're able to clearly see if traffic is safe for them to cross and enter into. (Tr. 43 at 168:25-169:5).

Officer Dylla then testified that, before the Ordinance, she would observe that when cars are trying to go in or out of the Clinic, some of the protestors would go very close to the cars, which made it really difficult for them to see oncoming traffic and leave that Clinic, or come in, safely. (Tr. 43 at 182:4-8). Further, Officer Dylla testified that, after the Ordinance was adopted, she has seen improvement from those

issues, including the cars having more room to safely come in and out of the Clinic. (Tr. 43 at 182:9-16).

### 1.    Conditions At the Clinic on Tuesdays And Thursdays.

Lt. Wannos recalled two occasions on which the police were called to the Clinic on Tuesdays or Thursdays. One of those occasions was presumably the same incident in which Tuthill was attacked by a Clinic patron, as described by Migliore. Wannos stated the incident he was referencing had occurred after enactment of the Ordinance, just prior to the injunction hearing. Wannos characterized that incident as "an altercation between a client's male friend and a protester standing on the sidewalk, outside of the exclusion area zone." (Tr. at 135, 156).

### 2.    Police Activity at The Clinic on Saturdays.

Lt. Wannos testified and described videos of alleged disturbances at the Clinic on two Saturdays preceding enactment of the Ordinance (June 15, 2019, November 19, 2019), and on two Saturdays after enactment of the Ordinance (March 18, 2023 and April 15, 2023). (Tr. at 135-136, 139, 140-143).

Lt. Wannos stated that since enactment of the Ordinance, the number of people who enter or occupy the public driveway has declined. (Tr. 43 at 152). But, even after the Ordinance's adoption, police are still called to the Clinic on a weekly basis on Saturdays to help ensure the safety of the Clinic driveway (with two of those incidents being the subject of the videos mentioned above). (Tr. at 146, 162).

Officer Josey-Filer testified that beginning in February 2023, she had worked on Saturdays as an off-duty officer at the Clinic. (Tr. at 167168). Her only knowledge regarding what occurs at the Clinic is related to Saturdays. (Tr. at 168).

She testified that the three arrests she had been involved with at the Clinic were arrests of people who violated the Ordinance twice in a row, had been issued a warning, then issued a citation and then were arrested. (Tr. at 173). Arrests, such as the arrests of a person named Nicholas Bosstick, an individual not affiliated with FPR, were made for "resisting/obstruction without violence." (Tr. at 174-175; Doc.44-4 at 7-8, 15-16).

### 3. Traffic-Related Issues.

Mr. Mahurin Testified that when it comes to the vehicular issues of the Clinic's driveway, it would be better for vehicles to park than to pull into the driveway and be stopped to conduct a conversation because there is a possibility of cars that might be coming in behind the stopped vehicle. (Tr. 43 at 53:10-21).

The City acknowledged that there were no other alternatives that would sufficiently advance the vehicle safety issues that were the sole inspiration for the Ordinance. The City observed that even though this was the Clinic's driveway, it is located on the public right of way, therefore trespassing individuals would not be a useful remedy at law. (Doc. 16-5 at 2).

Contrary to the "alternative" proposed by Plaintiffs, Officer Josey-Filer testified that Fla. Stat. Ann. §316.2045 (2021), titled "obstruction of Public Streets, Highways and Roads," was not applicable to the driveway at the Clinic. based on her knowledge and training. (Tr. 43 at 177:16-178:5). Officer Dylla clarified that Fla. Stat. Ann. §316.2045 references roads and highways and the driveway is not considered by the Clearwater Police Department to be a road or highway. (Tr. at 187:22-25).

The City established that there were no other alternatives that would sufficiently advance the vehicle safety issues that were the sole inspiration for the Ordinance, and that the Ordinance dramatically advanced public safety with a *de minimis*, if even that, impact on expressive activities.

### III. Standard of Review.

This Court reviews decisions "to deny a preliminary injunction for abuse of discretion." *Allied Veterans of the World, Inc. v. Seminole*, D.C. Docket No. 6:11-cv-00155-JA-GJK, No. 11-12185, at 3 (11th Cir. Mar 21, 2012) (citing *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011).

> This limited review is necessitated because the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief. Weighing these considerations is the responsibility of the district court . . . .

*Id.* at 3-4 (citing *Revette v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 740 F.2d 892, 893 (11th Cir. 1984).

## SUMMARY OF ARGUMENT

I.      Plaintiffs are not likely to succeed on the merits that the Ordinance is not narrowly tailored or that it fails to leave open ample alternative means of communication.

A.      The City properly showed that the Ordinance does not burden substantially more speech than necessary to further any significant government interest. The Ordinance was adopted to limit the amount of issues related to vehicular safety and the vehicular ingress and egress. The Communication Center Data and the Police Reports showed that police were called on Tuesdays, Thursdays, and Saturdays to deal with these vehicular issues. (Doc. 26-5 at 11-12; and Doc. 44-2). The Ordinance not only substantially helped with the safety issues but was also narrowly tailored by putting only a 5-foot safety zone on the North and South side of the ***driveway*** that cars would travel on. This minimal safety zone left the protesters, pedestrians, and Plaintiffs the ability to be seen, heard, and hand out leaflets to patients entering or exiting the Clinic, without doing so in vehicular traffic.

The Plaintiffs are still able to hand out leaflets in the most common way they did before the Ordinance. Plaintiffs may wave at vehicles from the sidewalk, and hand out leaflets to people who park their cars and walk over to them. (Tr. 43 at

37:25-38:7; 104:21-105:8; 66:11-15) Further, nothing in the Ordinance prohibits patients from walking over to the Plaintiffs to get a Leaflet. (Tr. 43 at 87:16-21).

B.     The City properly showed that they "seriously undertook to address" the alleged problems with less restrictive means. The City found that the safety issues were unique to the Clinic's driveway and that trespassing individuals is not a remedy at law because the driveway is located on a public right of way. (Doc. 16-5 at 2). Further, other existing laws would not work. such as the Fla. Statute Sec 316.2045, because it did not include driveways such as the Clinic's driveway and, based on the police training and knowledge, this was not a statute that could be enforced because it was not reasonably construed as "Public Streets, Highways and Roads." (Tr. 43 at 177:16-178:5; and 187:22-25).

C.     The Ordinance also leaves open ample alternatives to Plaintiffs. The Plaintiffs are not prohibited from handing out Leaflets to patients that walk over to them. Further, the Plaintiffs can stand anywhere on the sidewalk outside of the 5-foot safety zone (just two to three steps away from the edge of the sidewalk). The Plaintiffs are also able to give their message to patients who park in the overflow parking lot field.

D.     This case is substantially different from the Sixth Circuit *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400 (6th Cir. 2022). In *Sisters for Life*, the Ordinance imposed a ten-foot Safety zone around the entrance of **any**

healthcare facility in the County. *Id*. at 402. The Court emphasized that the county sought to advance its interest by imposing a Safety zone on all medical facilities in Louisville, when the record did not reveal problems beyond EMW. *Id* at 405. Contrary to *Sisters for Life,* this case involves an Ordinance placing a *de minimis* 5-foot safety zone on the North and South side of **one** driveway shown to have vehicular safety issues, not just an "entrance."

 E. The numerous federal cases that Plaintiff cites below have substantially different facts than this case. The federal cases cited all had laws barring people from handing leaflets to, or soliciting from, vehicle occupants on multiple streets and highways. The instant action involves only a 5-foot safety zone on one driveway shown to have vehicular safety issues, and in need of some method of protecting people in the path of vehicles.

 II. Plaintiffs do not satisfy the remaining injunction factors. The Plaintiffs are not suffering irreparable harm and the Injunction would be adverse to the public interest.

## ARGUMENT

 "A preliminary injunction is an extraordinary and drastic remedy." *Sheets v. City of Punta Gorda, Florida*, 415 F.Supp.3d 1115, 1121 (M.D. Fla. 2019) (quoting *Munaf v. Geren*, 553 U.S. 674, 689 (2008). On a motion for preliminary injunction under Fed. R. Civ. P. 65(a), "the movant must 'clearly establish': (1) substantial

likelihood of success on the merits; (2) irreparable injury; (3) the injury to the movant outweighs any to the opposing party; and (4) the injunction would not be adverse to the public interest." *Moms for Liberty v. Brevard Public Schools*, 582 F.Supp.3d 1214, 1218 (M.D. Fla. 2022) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). If the first element is unproven, a court can deny preliminary injunction without considering the others. *Sheets*, at 1121 (quoting *Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001).

## I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE THE ORDINANCE DOES NOT VIOLATE INTERMEDIATE SCRUTINY.

On a content neutral regulation[2], "courts apply intermediate scrutiny and ask whether it is narrowly tailored to serve a significant governmental interest." *Bruni*, 941 F.3d at 83-84. A content-neutral time, place, and manner regulation must not "burden substantially more speech than is necessary to further the government's legitimate interest." *McCullen*, 134 S.Ct. at 2535.

The regulation need not be "the least restrictive or least intrusive means of furthering that interest. See *Ward v. Rock Against Racism*, 491 U.S. 781, 789 (1989). Instead, a challenged regulation is narrowly tailored if it "promotes a substantial government interest that would be achieved less efficiently absent the regulation."

---

[2] Plaintiffs do not raise that the Ordinance is content-based facially or as-applied in this appeal. (Appellants' Brief at 5, n. 2; and 25, n. 6).

*Id.* at 799. If the means chosen "are not substantially broader than necessary to achieve the government's interest," a court cannot invalidate a regulation simply because it "concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800.

In this case, the Ordinance was drafted to limit the amount of issues related to vehicular ingress and egress by putting a 5-foot Safety zone on the North and South side of the driveway. While still allowing pedestrians, protesters, and the Plaintiffs to be seen, heard, and pass out leaflets. As the District Court found the vehicular safety concerns were established through the Communications Center Data on Clearwater Police Department's visits to the Clinic to address interference with vehicles entering and exiting the facility there, and the video footage admitted at the hearing depicting protesters outside the Clinic obstructing the driveway and the view of drivers entering or exiting the Clinic. (Doc. 45 at 19).

Additionally, Plaintiffs appear to be purposefully ignoring the dramatic distinctions between Clearwater's Ordinance and the regulations at issue in *McCullen*. As the District Court found, the *de minimis* safety zone, essentially to keep people out of the path of oncoming or outgoing traffic, has absolutely no similarity to the 35-foot restriction in *McCullen*. Additionally, *McCullen* had no connection with an effort to achieve vehicular and pedestrian safety, it was more designed to prevent confrontations. Based on these distinctions, the Plaintiffs' efforts

to criticize the District Court by saying "the government [] 'may not regulate expression in such manner that a substantial portion of the burden on speech does not serve to advance its goals,'" purposefully ignores these critical differences.

Similarly, in *Sisters for Life*, 56 F.4th 400, holding that 10-foot buffer zone outside an abortion clinic violated intermediate scrutiny, however, that applied to the entrance of clinics and had nothing to do with any effort to protect vehicular and pedestrian safety. Based on these distinctions, the City has clearly demonstrated that its Ordinance does not "burden substantially more speech than is necessary to further [any] legitimate interests." *Ward*, 491 U.S. at 799.

A. **Plaintiffs' Speech is Protected by the First Amendment, but that Does not Insulate such Speech from Content Neutral Regulations that are Clearly Designed to Protect the Public Safety.**

The City does not disagree that leafleting and education on the public sidewalk is protected by the First Amendment. Public ways and sidewalks are traditional public forums for their protected speech. Presumably, driveways are not. The City recognizes that the government's right to control the dissemination of information or expressive activity in a traditional public forum is necessarily limited by the First Amendment. *Perry Educ. Assoc. v. Perry Local Educators' Assoc.*, 460 U.S. 37, 45 (1983). That being said, the Supreme Court has afforded the government "wider leeway to regulate features of speech unrelated to its content." *McCullen*, 576 U.S. at 477. "Even in a public forum the government may impose reasonable restrictions

on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293 (1984).

The Clearwater Ordinance was carefully drafted with such important concerns in mind. The simple "vehicular safety" characteristics of this Ordinance meet all necessary criteria, because the Ordinance is "justified without reference to the content of the regulated speech," and leaves open ample alternative channels for communication of the information, albeit 5-feet away.

As previously stated, in order to justify a government's time, place, or manner restriction on protected speech, the restriction must be narrowly tailored to serve significant government interests. *Ward*, 491 U.S. at 796. Generally speaking, it is common practice for a government entity to exercise its "police powers to protect the health and safety of its citizens," *Hill v. Colorado*, 530 U.S. 703, 715 (2000) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475 (1996), and the City has a significant governmental interest in providing safe and unobstructed access to this Clinic, as it would for any driveway.

The Plaintiffs claim that their speech is limited because it cuts off their availability from getting closer than 5-feet to distribute leaflets to vehicles and engage in sidewalk counseling. However, the Plaintiffs did not commonly distribute leaflets directly to the vehicles in the driveway, no would any effort to engage in "sidewalk counseling" be advisable in the middle of the driveway with outgoing and incoming traffic. As testified by the Plaintiffs, before the Ordinance, Mr. Mahurin stated that most vehicles who pulled into the driveway would have their windows up and air conditioning on. (Tr. 43 at 55:7-12). Further, Mr. Mahurin testified that, before the Ordinance, handing a leaflet to a vehicle from the sidewalk was less likely than having an actual conversation. (Tr. 43 at 59:23-60:4). Mr. Tuthill testified the 60 leaflets he gave out, before the Ordinance, were all from people that parked and came up to Mr. Tuthill. (Tr. 43 at 66:11-15). Further, Mr. Tuthill testified that if he was to wave patients down and they were interested in a leaflet, nothing in the Ordinance would prohibit patients from walking up to Mr. Tuthill to get a leaflet from him. (Tr. 43 at 87:16-21).

Further as the District Court found, the "Vehicular Safety Zone permits a clear line of sight to incoming vehicles, exiting vehicles, and vehicles parked in the North and South parking areas of the property." (Doc. 45 at 12). Thus, the Ordinance imposes no restrictions on the Plaintiffs being able to achieve eye contact with those willing to communicate with them.

Notably, Plaintiffs purposely exclude the very photographs that they presented that the District Court relied on in reaching its conclusions: "The evidence conclusively demonstrated that Plaintiffs … maintain a clear line of sight into each side of the Centers lost and on or across the driveway, as shown in the below photographs:"





(Doc. 45 at 12).

## B.    The City's Ordinance is Narrowly Tailored.

The City has shown that the Ordinance is sufficiently narrowly tailored to survive the requisite intermediate scrutiny for time, place, and manner laws that

involve protected speech.  First, the Ordinance not only substantially helped with the safety issues but also was narrowly tailored by putting only a 5-foot safety zone on the North and South side of the driveway, and that let the protesters, pedestrians, and Plaintiffs be seen, heard, and hand out leaflets to patients entering or exiting the Clinic. Second, the City has shown that they seriously considered less intrusive tools but that Trespassing laws would not be a remedy at law, and other criminal citations and arrests did not solve the issues.

### 1.    The Ordinance Does Not Burden Substantially More Speech than Necessary.

For a content-neutral regulation, "[courts] apply intermediate scrutiny and ask whether it is 'narrowly tailored to serve a significant governmental interest.'" *Bruni*, 941 F.3d at 83–84 (internal citations omitted). A content-neutral time, place, and manner regulation must not "burden substantially more speech than is necessary to further the government's legitimate interests." See *McCullen*, 573 U.S. at 486.

Notably, the regulation need not be "the least restrictive or least intrusive means" of furthering that interest. See *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). Instead, a challenged regulation is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." Id. at 799. If the means chosen "are not substantially broader than necessary to achieve the government's interest," a court cannot invalidate a

regulation simply because it "concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800.

Importantly, the City's 5-foot standard is significantly less stringent than those applied by the Supreme Court in *Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 374 (1997). This case involved a fixed Safety zones outside medical facility significantly greater than the City's 5-foot "Safety zone."

In its analysis of the statewide Safety zone law created in Massachusetts, the *McCullen* Court found that "[f]or a problem shown to arise only once a week in one city at one Clinic, creating 35-foot Safety zones at every Clinic across the Commonwealth is hardly a narrowly tailored solution," 134 S.Ct. at 2539. Indeed, the suggestion is that a more limited application to a more limited area could well be justified. This Ordinance covers one Clinic in one City and deals specifically with the unique "geographic" characteristics of the driveway to the Clinic. The scope of this "place" restriction in the Ordinance is much more narrowly tailored than what was found invalid in *McCullen*.

The Plaintiffs attempt to compare their case to *McCullen* by making a technical argument focusing on a course of conduct that was never the focal point of their communication efforts. First, the Plaintiffs assert that the Ordinance restricts speech unassociated with the City's concerns, claiming that the purpose focused on protesters and the Plaintiffs are sidewalk counselors. (Appellants Brief at 34). This

distinction is really only irrelevant nomenclature, since the Ordinance's purpose is not related to any "counseling," but to address the obstruction of vehicular ingress and egress. The Ordinance is narrowly tailored to address "protestors," "counselors," "pedestrians," or anyone who impedes traffic. This in no way would stop the "close and personal conversations" that the Plaintiffs can have with those on the sidewalk.

Second, Plaintiffs claim that the Ordinance seriously burdens Plaintiffs' speech because, "before its passage they readily distributed leaflets directly to, and quietly conversed with, drivers and their passengers." (Appellants' Brief at 35). However, the Plaintiffs did not commonly distribute leaflets to the vehicles from the sidewalk. Before the Ordinance, Mr. Mahurin stated that most vehicles who pulled into the driveway would have their windows up and air conditioning on. (Tr. 43 at 55:7-12). Further, Mr. Mahurin testified that, before the Ordinance, handing a leaflet to a vehicle from the sidewalk was less likely than having an actual conversation. (Tr. 43 at 59:23-60:4; 38:1-7). Mr. Tuthill testified the 60 leaflets he gave out, before the Ordinance, were all from people that parked and came up to Mr. Tuthill. (Tr. 43 at 66:11-15). Further, Mr. Tuthill testified that if he was to wave patients down and they were interested in a leaflet, nothing in the Ordinance would prohibit patients from walking up to Mr. Tuthill to get a leaflet from him. (Tr. 43 at 87:16-21). Thus, the Plaintiffs have not been burdened by the 5-foot Safety zone because they are still

able to flag down vehicles and hand out leaflets to anyone that comes over to them. (which was what they were commonly doing before).

Further, many of the Plaintiffs testified that they regularly stood at the edge of the sidewalk. (Tr. 43 at 34:14-19; 35:2-6; 54:2-9). This Ordinance had an insignificant effect of requiring the Plaintiffs to step two to three steps back from the driveway, where, as described above, caused them no substantial burden to be seen, heard, or to leaflet.

The District Court correctly faulted Mr. Tuthill for stating that he had stopped trying to distribute leaflets after the Ordinance. (Doc.45 at 13, ¶18). Mr. Tuthill testified that he handed out 50 to 60 leaflets before the Ordinance. (Tr. 43 at 65:9-12). Mr. Tuthill testified the 60 leaflets he gave out were all from people that parked and came up to Mr. Tuthill. (Tr. 43 at 66:11-15). Further, Mr. Tuthill testified that if he was to wave patients down and they were interested in a leaflet, nothing in the Ordinance would prohibit patients from walking up to Mr. Tuthill to get a leaflet from him. (Tr. 43 at 87:16-21). Mr. Tuthill testified that, with the Safety zone in place, Mr. Tuthill does not try to flag them down to hand out leaflets. (Tr. 43 at 87:2-7). Although the Plaintiffs try to claim that he stopped trying to distribute leaflets because it was impossible to leaflet directly to vehicles, Mr. Tuthill was only leafleting to people who had parked their vehicle and walked over to him. Further,

the Plaintiffs are not so far back that it prevents their efforts to wave and flag down vehicles to let them know they can talk to them once they have parked.

Third, Plaintiffs try to emphasize that the Plaintiffs are substantially limited by their speech by not directly leafleting from the sidewalk to the vehicles and that it is "no answer that Plaintiffs are allowed to leaflet and counsel outside of the Safety zone." (Appellants' Brief at 37-38). However, the Plaintiffs testimony during the hearing continually showed that, before the Ordinance, they could wave at the vehicles, and most vehicles park in the parking lot and then come over to them for a leaflet. (Tr. 43 at 34:12-25; 37:17-38:7; 54:2-9; 57:15-25; 59:23-60:4; 104:18-105:8; 109:13-110:3). This Ordinance does not substantially limit the Plaintiffs' unique training to be seen by the moving cars, to wave at the vehicles, to have the patients park their vehicles and come over to the Plaintiffs to get a leaflet.

Plaintiff Goldsberry testified that handing out leaflets "to people in vehicles entering or exiting the Clinic ... has been one of our main activities at the Clinic and is one of the principal objectives of sidewalk counseling." (Appellant Brief 37-38). However, at the Hearing, it was stated that Goldsberry is not as engaging with the women and that she likes to just hold a sign and pray her rosary. (Tr. 43 at 43:6-44:13).

Plaintiffs claim that this Ordinance has hindered their attempts to speak in sidewalk counseling voices. However, Plaintiffs can still choose to whisper if they

want, and Plaintiffs' normal sidewalk counseling voices can carry an additional 5-feet as shown in demonstrations conducted in Court during the hearing. (Tr. 43 at 60:14-61:5). Further, Plaintiff Migliore testified that a patron who was near the entrance, behind the fence, on the south side of the Safety zone was engaged in conversation with Magloire while she was on the Northside, inside the Safety zone. (Tr. 43 at 128). This same patron stood outside the Safety zone and was able to reach Allen Tuthill who was inside the Safety zone to knock leaflets out of his hands. (Tr. 43 at 128).

Fourth, Plaintiffs use *McCullen*'s finding that "[f]or a problem shown to arise only once a week in one city at one Clinic, creating 35-foot buffer zones at every Clinic across the Commonwealth is hardly a narrowly tailored solution," 134 S.Ct. at 2539. Plaintiffs claim that this case is similar because the majority of issues happen on Saturdays. (Appellants Brief at 40). However, as the District Court found, these issues have also occurred on Tuesdays and Thursdays. (Doc. 45 at 10, n.3). As Lt. Wannos testified, he has been called to the Clinic on a Tuesday and a Thursday. (Tr. 43 at 156:1-10). Further, the Communication Center Data and the Police Reports show that there were even more police calls on Tuesdays and Thursdays. (Doc. 26-5; Doc. 44-2).

Further, the Ordinance is narrower than *McCullen's* 35-foot buffer zone at every Clinic around "Commonwealth," because, this is a 5-foot Safety zone on the

North and South side of the driveway at *one* Clinic that addresses the direct concerns with the unique issues involved at this one Clinic, the ***safe*** ingress and egress of vehicles.

The Plaintiff claims that the Police reports describe all but two responses occurred on Saturdays, and the two non-Saturday incidents involved respectively, a complaint about noise by a non-Plaintiff protestor, and an arrest of a Clinic-patron male for committing aggravated assault against a pro-life female. This is not the case, the Communication Center Data provides five incidents that happened on a Tuesday or Thursday, and most being described as for a protest/demonstration issue. (Doc. 26-5) Further the Police Reports show three more incidents that happened on a Tuesday or Thursday. (Doc. 13-3: 22-26, 27, 108). With these incidents involving a protest/demonstration, and including complaints about noise, assault, and approaching patrons on foot or in vehicles and going onto the property, there is nothing "quiet" about the times the Plaintiffs want engage in their activities. (Doc. 13-3: 23, 27-28, 108).

Next, the Plaintiffs state that Lt. Wannos admitted there have been no vehicle accidents or related injuries even on Saturdays. However, Officer Wannos testified that the depictions from the police videos showed congestion in the driveway, pedestrians that were impairing the vision of the drivers of the vehicles, (Tr. 43 at 139:8-22), pedestrians acting as a barrier or safety between the vehicle and other

individuals, (Tr. 43 at 141:12-22), and the fact that the conditions before the Ordinance made it difficult and dangerous for both the occupants and drivers of the vehicles as well as the individuals standing in the driveway. (Tr. 43 at 143:13-23). Additionally, Lt. Wannos testified that someone who stands by a passenger or a driver's side window would impair the drivers ability to see to safely operate a vehicle. (Tr. 43 at 153:14-23). Officer Josey-filer testified that, before the Ordinance, she observed people approaching vehicles as they tried to enter and exit, standing and holding signs, blocking the view of vehicles trying to exit and trying to speak to those inside the vehicles, which limited the driver's ability to safely operate the vehicles. (Tr. 43 at 168:10-13). Officer Dylla testified that, before the Ordinance, she would observe that when cars were trying to go in or out of the Clinic, some of the protestors would go very close to the cars, which makes it really difficult for drivers to see oncoming traffic and leave that Clinic or come in safely. (Tr. 43 at 182:4-8).

Plaintiffs claimed that the escorts who used umbrellas to shield patients walking from their cars into the Clinic necessarily impair the view of oncoming traffic. There was no evidence of this. Further, escorts were there to assist patients to safely enter and exit the Clinic. not to get their attention or try to block their view with information.

Last, Plaintiffs stated that the incident reports and videos show that verbal altercations and unreasonable noise have only continued on Saturdays—further

exposing the Ordinance's poor "fit between ends and means" required by the First Amendment. (Appellants Brief at 44, n.13). Nonetheless, the Ordinance significantly reduced the vehicular safety issues the Ordinance was adopted to limit every day the Clinic was open.

Officer Dylla testified that after the Ordinance was adopted, she has seen improvement from those issues, including the cars having more room to come in and out of the Clinic. (Tr. 43 at 182:9-16). Officer Josey-Filer testified that, after the Ordinance, she observed improvement of these issues, including vehicles being able to come in without having people in the driveway obstructing their entry into the establishment. She testified that, even when people go to leave, they're able to clearly see if traffic is safe for them to cross and enter into. (Tr. 43 at 168:25-169:5). Lt. Wannos testified that, after the Ordinance was adopted, the number of individuals who continued to stay, enter, or remain within that safety zone had declined significantly. (Tr. 43 at 152:7-153:13). Lt. Wannos testified that the safety zone has drastically improved the safety of the pedestrians, the protesters, and those coming and going from the Clinic, as well as everybody on the roadway. (Tr. 43 at 152:7-24).

Based on this evidence and testimony, the District Court was accurate when it concluded that the City's Safety zone does not burden substantially more speech than necessary to achieve its asserted interests. Based on the vehicular safety sought to

be achieved by the Ordinance, the City has made every effort to tailor the Ordinance to address these legitimate concerns. As Stated in *Am. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384–85, 210 L.Ed.2d 716 (2021), "Narrow tailoring turns on whether a law sweeps more broadly than necessary, not on whether its yoke is heavy or light." In the instant action, the City's Ordinance sweeps no more broadly than necessary to achieve its goal: vehicular safety.

### 2. The City has Shown that it Seriously Sought to Consider Less Restrictive Means to Deal with the Issues the Ordinance was Adopted to Address

When dealing with a "legitimate governmental interest," like vehicular and pedestrian safety, a regulation need not be "the least restrictive or least intrusive means of furthering that interest." See *Ward v. Rock Against Racism*, 491 U.S. 781, 789 (1989). Instead, a challenged regulation can be found appropriately "narrowly tailored" if it "promotes a substantial government interest that would be achieved less efficiently absent the regulation." *Id*. at 799. If the means chosen "are not substantially broader than necessary to achieve the government's interest," a court cannot invalidate a regulation simply because it "concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id*. at 800.

Further, where there is only slight burden on speech any challenge would struggle to show that "alternative measures would burden substantially less speech."

(*Bruni v. City of Pittsburg*, 941 F.3d 73, 89 (3rd Cir. 2019) (quoting *McCullen*, 573 U.S. at 495). "[*McCullen*] also made clear that (and logic dictates) that a less demanding inquiry is called for where the burden on speech is not significant-whether due to a restrictions scope, the size of free speech zone, or some combination of the two." *Id.*

The Court in *Bruni* discussed the inquiry of alternative measures extensively,

> ...where the burden imposed by a restriction on speech is not significant, the government need demonstrate neither that "it has tried or considered every less burdensome alternative," *Bruni I*, 824 F.3d at 370, nor that it tried or considered every less burdensome alternative discussed in *McCullen*. Instead, as we reiterated in *Turco*, this is an "intensely factual ... inquiry," 935 F.3d at 170, that must account for "the 'broad principle of deference to legislative judgments' and that a legislative body 'need not meticulously vet every less burdensome alternative,' " id. at 171 (quoting *Bruni I*, 824 F.3d at 370 n.18 ). And, as we recognized there in remanding for further fact-finding, a municipality can demonstrate that it "attempted ... [or] considered alternative means of bringing order to the sidewalk" even if it "ha[s] not 'prosecute[d] any protestors for activities taking place on the sidewalk' and 'did not seek injunctive relief against individuals whose conduct was the impetus for the Ordinance.' " Id. at 167 (second alteration in original) (quoting *Turco v. City of Englewood*, No. 2:15-cv-03008, 2017 WL 5479509, at *5 (D.N.J. Nov. 14, 2017)

*Id.* at 91.

As shown above, the Ordinance is virtually no burden on speech. The Ordinance only creates a 5-foot safety zone from the driveway (two to three steps back from where they were before the Ordinance) where protesters, pedestrians, and the Plaintiffs can be easily seen, heard, and still effectively pass out leaflets.

The City, in the adoption of Ordinance 9665-23, concluded that generic criminal statutes, like trespassing, harassment, or obstruction prohibitions, or other such alternatives. Would be ineffective until the Ordinance was passed to provide the specific protections needed. Indeed, none of these "after the fact" citation mechanisms would help address or advance vehicular safety. The safety zone for the Clinic's driveway is limited to 5-feet and is necessary to permit clear ingress and egress to and from the Clinic. No other type of regulation would be so tailored to the specific issues to be addressed. Moreover, this regulation applies only to the driveway of the Clinic. Courts have acknowledged that governments may have a substantial interest in regulating activity around both public and private places, including medical facilities. *Hill v. Colorado*, 530 U.S. 703, 728 (2000).

As the District Court correctly found, the City considered potentially less restrictive alternatives, such as trespass warnings and targeted arrests, but these alternative would not adequately address the vehicular safety concerns. (Doc 45 at 19). Because of the unique characteristics of the issues pertaining to the Clinic's driveway with an intersecting right-of-way, the other remedies would not achieve the City's interest in vehicular and pedestrian safety. As stated in the whereas clauses of the Ordinance:

> WHEREAS, targeted trespass warnings to individuals impeding vehicular ingress and egress is not a remedy available by law because the driveway is located on the public right-of-way; and

WHEREAS, targeted arrests for resisting an officer without violence are impractical because the protesters will temporarily comply with an officer's instructions whenever told to vacate the driveway and allow vehicular access, but the protesters re-enter or continue crossing the driveway after the officer leaves the scene and Florida law prohibits officers from arresting the violator(s) for misdemeanor crimes not committed in the officer's presence;

(Doc. 16-5 at 2)

Coupled with the Clearwater Police Department pursuing such alternative measures when they repeatedly responded on an *ad hoc* basis to incidents involving battery, disorder, noise, ordinance violation, criminal mischief, and the like at the Center (Doc. 26-5, Doc. 44-2), it is clear that the City considered alternative means to limit the issues relating to vehicular safety on the Clinic driveway and properly concluded that none would be as effective or properly targeted as the *de minimis* 5-foot safety zone

The Plaintiffs claim that "the City has also glaringly failed to enforce a directly applicable state statute forbidding obstruction of any "public street, highway, or road," including by "[i]mpeding, hindering, stifling, or restraining traffic or passage thereon." Fla. Stat. Ann. §316.2045(1)(a)(1)." (Appellant's Brief at 50). However, Officer Josey-Filer testified that Fla. Stat. Ann. §316.2045 (2021), titled "Obstruction of Public Streets, Highways and Roads, was not applicable to the Driveway at Bread and Roses Clinic based on her knowledge and training. (Tr. 43 at 177:16-178:5). Further, Officer Dylla clarified that the statute references "roads and

highways" and the driveway is not considered by the Clearwater Police Department to be a "road or highway." (Tr. 43 at 187:22-25). Further, this statute has had a history of being found unconstitutional for its overbreadth and, as one court has discussed after the statute's most recent amendment:

> As to Plaintiffs' claim that section 2 is overbroad, this Court recognizes that the statute it amends—section 316.2045—has not withstood constitutional challenges in the past. See *Bischoff v. Florida*, 242 F. Supp. 2d 1226 (M.D. Fla. 2003). The Florida Legislature appears to have tried to fix the problems highlighted in *Bischoff* with the amendments passed in section 2 of the Act. *Nonetheless, this Court finds Plaintiffs have plausibly alleged that the amended version of section 316.2045 continues to "sweep unnecessarily broadly and thereby invade" protected speech, and thus, is arguably overbroad.* *Bischoff*, 242 F. Supp. 2d at 1245 (quoting *NAACP v. Alabama* , 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) ). However, this is certainly not the end of the matter, and Defendants may further develop their arguments as to this claim at the summary-judgment stage.

*Dream Defenders v. Desantis*, 553 F. Supp. 3d 1052, 1098 (N.D. Fla. 2021). Because of all these issues with Sec. 316.2045, the City found that it would not be the correct method in limiting the Clinic's unique vehicular and pedestrian safety issues.

The Plaintiffs claim that "the City has additionally failed to explain why it could not enact new laws that are more narrowly targeted, as *McCullen* instructed… such as a Saturday-only zone." (Appellants Brief at 51). This, however, does not stop the vehicle issues that have been shown to also happen on Tuesdays and Thursdays as shown in the Communication Center Data and the Police Reports (Doc 26-5, Doc. 44-2).

The Plaintiffs stretch to find other exaggerated ways to inaccurately describe other ways that they claim the City had not considered "less restrictive" alternatives, but, based on the extensive testimony give the City Police Officers, the Ordinance is clearly the most effective means in protecting vehicular and pedestrian safety while also not substantially burdening speech. Further, If the means chosen "are not substantially broader than necessary to achieve the government's interest," a court cannot invalidate a regulation simply because it "concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800.

The Plaintiffs are inappropriately critical of the City's choice of the 5-foot safety zone and urge significantly more tedious and less efficient alternatives, such as "a public nuisance action, see, e.g., *Pompano Horse Club v. State*, 93 Fla. 415, 441 (1927); a new law authorizing the City to pursue such relief for traffic obstruction; or working with the Clinic or other aggrieved persons to bring private actions under the FACE Act, as authorized by 18 U.S.C. §248(c)(1)(A), see, e.g., *Allentown Women's Ctr., Inc. v. Sulpizio*, 403 F.Supp.3d 461 (E.D. Pa. 2019).

Contrary to Plaintiffs' assertions, the District Court, accurately found the Ordinance narrowly tailored for legitimate reasons, none of which implicate *McCullen.* Pointing to the 25-foot safety zone upheld by this Court in *Lucero v. Trosch*, 121 F.3d 591 (11th Cir. 1997) (Doc. 45 at 21), the bottom line is that ***none***

of the cases asserted by Plaintiffs as a basis for criticism of the District Court's Order involve a *de minimis* 5-foot safety zone, specifically designed to improve both vehicular and pedestrian safety.

The District Court also credited the Ordinance's express recital of the City's "familiar[ity] with" the Third Circuit's "ruling in *Bruni v. City of Pittsburgh*, 941 F.3d 73 (3d Cir. 2019)," which upheld an allegedly similar 15-foot safety zone in Pittsburgh, Pennsylvania. (Doc.45 at 2223; Doc.16-5 at 2). Plaintiffs attempt to distinguish the Ordinance in *Bruni* by stating *Bruni* prohibited only "congregat[ing], patrol[ling], picket[ing] or demonstrate[ing]" in the zone, and that the Third Circuit expressly clarified that "the Ordinance as written does not prohibit the sidewalk counseling in which Plaintiffs seek to engage within the zone," which includes "one-on-one conversations about abortion" and "passing a leaflet." *Id*. at 85-86. However, in this case, the Ordinance does not limit the Plaintiffs' sidewalk counseling, since they can clearly use their voices to attract individuals who are desirous of receiving sidewalk counseling, since they are only 5-feet away from the driveway, and it would be incredulous to assert any right to engage in sidewalk counseling in the middle of a driveway with outgoing and incoming traffic. Plaintiffs are still able to reach out and hand anyone a leaflet, as they are only two to three steps back from the sidewalk edge (where they were before the Ordinance). Further, the patients are not prohibited from walking over to any of the Plaintiffs to grab a leaflet. Which, as confirmed by

the Plaintiffs' own testimony, was the most common way Plaintiffs handed leaflets to any willing recipient. Indeed, such a clear delineation of the location avoids any kind of "abuse of discretion" with law enforcement officers trying to distinguish between "counseling" and "congregating," such as that dichotomy in *Bruni*. To deal with Plaintiffs' other criticisms, and to focus directly on the most significant distinction between the Clearwater Ordinance and the regulations at issue in *Bruni*, suffice it to say that the driveway outside the Clinic, in fact ***no driveway*** handling vehicular traffic that could pose danger to pedestrians, has even been found to be a "public forum," and Plaintiffs have the unfettered ability to be on the sidewalk, outside the driveway, counseling whomever wishes to be counseled.

Based on the nature of the vehicular safety concerns at the core of the Ordinance, there are simply no "less intrusive tools readily available" to the City, and the very limited 5-foot safety zone is not some "broad, prophylactic measure," such as that discussed in *McCullen,* but the least restrictive method of achieving vehicular safety.

### C.     The Ordinance Leaves Open Ample Alternatives.

"The First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981).

The District Court correctly found that the Plaintiffs have ample alternatives to communicate outside of the safety zone. The District Court noted that the Eleventh Circuit has found that "unlimited access to the city-owned streets and sidewalks adjacent to a prohibited area constitutes ample alternative channels of communication." *Daniel v. City of Tampa, Florida,* 38 F.3d 546, 550 (11th Cir. 1994). The Eleventh Circuit has also found that where an Ordinance "does not prohibit leafletting, distributing pamphlets, or marching on the streets adjacent to, or leading directly to the courthouse grounds, the appellant "has many alternative means to communicate its message." *Nationalist Movement v. City of Cumming, Ga.,* 92 F.3d 1135, 1140 (11th Cir. 1996). The District Court than correctly concluded that similarly to *Daniel* and *Nationalist Movement,* Plaintiffs may still engage in their usual respective activities on the full expanse of the remaining sidewalks on either side of the private driveway outside the Vehicular Safety Zone." (Doc. 45 at 27-28).

Additionally, The Plaintiffs can stand at the perimeter of the safety zone, applied only to the Clinic driveway, and speak in a conversational tone no different than the tone used across a dinner-table. In fact, under the Ordinance, Plaintiffs can hand out any type of leaflets they would like to distribute, so long as they remain outside the 5-foot safety zone located at the driveway. It is up to those passing by to decide if they which to accept anyone's literature as would be the case anywhere on

a city sidewalk. As would be obvious, the Safety zone would have no impact whatsoever on a persons ability to offer literature to a passerby anywhere outside the Safety zone, and there is nothing preventing individuals who have already crossed into the Safety zone from simply reaching out of the zone to accept any leaflet.

Plaintiffs' cases are substantially different than this case. Plaintiffs cite *McCraw v. City of Okla.*, 973 F.3d 1057 (10th Cir. 2020) where the court held that for those who engage with passing vehicles, moving from the median to the sidewalk would not be an adequate alternative because that would put them out of sightline for most drivers because there are eight to nine lanes of traffic and if you on a sidewalk you can only see the lanes right next to you but if you are in a median you can catch traffic from all four directions. *Id.* at 1079. This case is very different from *McCraw*. In this case, there are not multiple lanes of traffic where there is a need to be in the sightline for passing vehicles. Further, the Plaintiffs are only required to take two to three steps back from where they were before the Ordinance. The Plaintiffs are still able to talk in normal voices, wave and flag down vehicles, and pass out leaflets to people who walk over to them.

Plaintiffs next cite *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002). *Weinberg* held a statute that restricted a person from peddling merchandise, of any type, on any portion of the public way within 1,000 feet of their "United Center" unconstitutional. *Id.* at 1042. *Weinberg* found that the alternatives to sell his

book via the internet, through a bookstore, or in other areas of the city were not ample because his intended audience, Chicago Blackhawk fans, are a different market than a market for bookstore readers or internet users. *Id.* This is nothing even remotely like the 5-foor safety zone in this case.

Accordingly, the Ordinance leaves ample alternatives to communicate the Plaintiffs message.

### D.  *Sisters For Life* is Significantly Different form this Case

The Plaintiffs try to compare the Sixth Circuit case *Sisters for Life v. Louisville-Jefferson County,* 56 F.4th 400 (6th Cir. 2022). However, there are several key reasons that this case is significantly different from *Sisters for Life*.

First, the *Sisters for Life* Ordinance extended "from the entrance of a healthcare facility to the closest adjacent sidewalk curb and 10 feet from side to side." *Id.* 403. The court found the Ordinance was not narrowly tailored because it applied to **all** medical facilities, when "only the EMW's health facilities challenges were unique." *Id.* at 405. In this case, the City has found unique challenges relating to vehicular safety at the Clinic and created an Ordinance that applied **only** to the to the Clinic based on those unique challenges.

Second, *Sisters for Life* found that the County did not show that it seriously undertook to address its concerns with less intrusive tools. *Id.* at 405. *Sisters for Life* points out that the "County's representative admitted that he could 'oftentimes'

'ascertain a violation' of existing county claws based on EMW's security footage, and that the County's only response is to say that this approach is more difficult." *Id.* at 405. *Sisters for Life* also pointed to the "Freedom of Access to Clinic Entrances Act," as authorized by 18 U.S.C. §248(c)(1)(A), which bars physical obstruction meant to interfere with access to Clinics, like EMW and which permits graduated civil penalties and criminal sanctions." *Id.* at 406.

In this case, the City did seriously consider less intrusive tools to address its concerns. However, as shown through the Communication Center Data, the Clearwater Police Reports, and the WHEREAS clauses of the Ordinance, the Clinic's driveway had unique obstacles in dealing with vehicular safety because it was a Clinic's ***driveway*** with a public right-of-way passing through it. The Police Department had been trying to use other means to limit vehicular safety issues but found that the issues had only been increasing. The videos depicted at the Motion for Preliminary Injunction hearing were from the Officer's body worn cameras. There would not have been enough video surveillance outside of the officer's presence to give criminal citations or to identify violators of other criminal laws. Further, many of the issues not only included access to the facility but also safety concerns on the Clinic's driveway, therefore, the FACE act would not help with the vehicular safety issues.

Lastly, the *Sisters for Life* court found that the toll on speech was substantial because individuals could not "initiate as many close personal conversations with Clinic entrants, since they must now stand several feet away from them; they cannot distribute as much literature, since distribution now takes place beyond an arm's length; and they can attempt far fewer quiet conversations with EMW's patients since noise from protestors makes such conversations infeasible absent entry into the safety zone." *Id.* at 407

This case has not had that same effect on the Plaintiffs. The Plaintiffs can still have those close personal conversations because, as they testified, they are only 5-feet back, and, as they usually wave to have patients come over to them, nothing changes that. (Tr. 43 at 37:17-38:7; 66:11-15; 104:21-105:8). The Plaintiffs are still able to be heard from 5-feet away as shown through the in-court demonstrations, (Tr. 43 at 60:14-61:5) and Plaintiff Migliore's testimony regarding her conversation with a person on the South side of the driveway, inside of the safety zone while she was on the North side of the driveway, outside of the safety zone, shows this does not have any toll on speech. (Tr. 43 at 128:8-25). The Plaintiffs are still able to distribute as much literature as they can entice a willing recipient to receive.. As the Plaintiffs testified, it is not common for them to hand out literature to a vehicle, it is more common, and, as Mr. Tuthill explained, before the Ordinance, *all* of his leaflets were handed to people who had parked and then walked over to him. (Tr. 43 at 66:11-15).

Unlike *Sisters for Life,* this case is based solely on the driveway's safety issues. Anyone who walks over to a moving vehicle as they enter or exit the Clinic causes safety issues and blocks the view of the drivers. (Tr. 43 at 53:10-21; 153:14-23; 168:10-13; 182:4-8).

**E.     This Case is Significantly Different from Numerous Federal Court Cases that have Recently Invalidated Bans on Street Solicitation and Leafleting.**

The "vehicular" context at issue in this action has been recognized as valid, even with something as protected as the distribution of leaflets:

> Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated. So long as legislation to this end does not abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature, it may lawfully regulate the conduct of those using the streets. For example, a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic; a group of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept a tendered leaflet; nor does the guarantee of freedom of speech or of the press deprive a municipality of power to enact regulations against throwing literature broadcast in the streets. Prohibition of such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion.

*Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 60 S.Ct. 146 (1939).

Plaintiff cites recent cases where federal circuits have held that laws formally or effectively banning non-obstructive street solicitation and leafleting violate First Amendment intermediate scrutiny. Plaintiffs cite *Brewer v. Albuquerque*, 18 F.4th 1205 (10th Cir. 2021). In *Brewer* the Court held that an Ordinance which "regulates pedestrian presence in and around roadways throughout Albuquerque" was unconstitutional. *Id.* at 1209. *Brewer* found that the evidence did not point to significant safety problems arising from pedestrian presence near ramps or on medians, or from exchanges between pedestrian and vehicle occupants and that those safety problems to which evidence does point are not likely to be ameliorated by relevant subsections of the Ordinance. *Id.* at 1228. Further *Brewer* found that the "Ordinance sweep broadly and substantially burden private speech, 'prohibiting *all* expressive activity in a wide variety of spaces where Albuquerque's citizens have historically … exercised their' First Amendment rights." *Id* at 1238.

In this case, the City has shown that the safety concerns the Ordinance was designed to advance were real, as noted by the inescapable findings of the District Court:

> The video footage admitted at the Hearing depicted Protesters protesting loudly, crossing the driveway repeatedly, rushing up to cars entering and exiting the driveway, and obstructing cars in the driveway. (See Dkt. 44 Sealed Ex. C – Videos to Present – Pre-Ordinance Bodycam Compilation.mp4, Pre-Ordinance –Submitted by Public for Ordinance.mov)

(Doc. 45 at 10).

This is also supported by additional evidence presented to the District Court, the Communication Data (Doc. 26-5), the Police Reports (Doc. 44-2), and the Officers testimony of the safety concerns. (Tr. 43 at 139:8-22; 141:12-22; 143:13-23; 155:25-156:6; 168:10-13; 182:4-8). Further, the Ordinance relates to only one driveway and has been shown that the Ordinance has significantly helped alleviate the issues it was created for. (Tr. 43 at 152:7-153:13; 168:25-169:5; 182:9-16). In this case, the District Court found that:

> "...free speech outside the Center remains quite robust, which is apparent based on a cursory review of the post-Ordinance video footage(See Dkt. 44 Sealed Ex. C – Videos to Present – Post-Ordinance 3- 18-23.mp4, Post-Ordinance 2 3-18-23.mp4, Post-Ordinance 4-15-23.mp4)"

(Doc. 45 at 15).

Plaintiffs cite *Cutting v. City of Portland*, 802 F.3d 79 (1st Cir. 2015). *The Cutting* court held that an Ordinance was unconstitutional because it "indiscriminately bans virtually all expressive activity in all of the City's median strips and thus is not narrowly tailored to serve the City's interest in protecting public safety." *Id* at 81. Contrary to *Cutting*, this case only puts a 5-foot safety zone on the sidewalk by one Clinic's driveway, a driveway which is not a public forum and where in the interest of protecting public safety human beings can be restricted to prevent the danger posed by outgoing and incoming traffic.

The Plaintiffs cite *Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015). *Reynolds* found that the Ordinance applied to "all County roads, regardless of location or traffic volume, and includes all medians, even wide medians and those beside traffic lights and stop signs." *Id.* at 231. The *Reynolds* court emphasized that, "Given the absence of evidence of a county-wide problem, the county-wide sweep of the Amended Ordinance burdens more speech than necessary, just as the statute in McCullen—a statewide statute aimed at a problem in one location—burdened more speech than necessary." *Id.* Again, contrary to Cutting, this case only puts a 5-foot safety zone on the sidewalk by one Clinic's driveway, a driveway which is not a public forum and where in the interest of protecting public safety human beings can be restricted to prevent the danger posed by outgoing and incoming traffic.

Plaintiffs cite *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 941 (9th Cir. 2011). In *Comite de Jornaleros de Redondo Beach* the Court found an Ordinance to be unconstitutional because the Ordinance applies citywide to all streets and sidewalks in the City, yet the City has introduced evidence of traffic problems only with respect to a small number of major streets and medians. Again, this case is different than *Comite de Jornaleros de Redondo Beach*, because this case only puts a 5-foot safety zone on the sidewalk by one Clinic's driveway, a driveway which is not a public forum and where in the interest

of protecting public safety human beings can be restricted to prevent the danger posed by outgoing and incoming traffic.

The Plaintiffs then cite *Bischoff v. Fla.*, 242 F. Supp. 2d 1226, 1237-38 (M.D. Fla. 2003). In *Bischoff* the Fla. Statute 316.2055 (1976) was found unconstitutional because it suppressed more speech than is necessary to serve the stated government purpose of ensuring safety on roads. The statute makes it "unlawful for any person on a public street, highway, or sidewalk in the state to throw into, or attempt to throw into, any motor vehicle, or offer, or attempt to offer, to any occupant of any motor vehicle, whether standing or moving, or to place or throw into any motor vehicle any advertising or soliciting materials or to cause or secure any person or persons to do any one of such unlawful acts." Florida Statute 316.2055 made it "unlawful for a pedestrian on a sidewalk to hand an advertising leaflet to a willing recipient in a car that has stopped in a metered space or in a private driveway, even though such conduct has no effect on traffic or safety." *Id.* at 1259.

This Case is contrary to *Bischoff*, because the Ordinance in this case pertains to a driveway that has been shown to have vehicle safety issues due to those approaching the vehicles and blocking the drivers' view. Further, this Ordinance pertains to one driveway and not any street, highway or sidewalk.

Last, Plaintiffs cite *McCraw v. City of Okla. City*, 973 F.3d 1057 (10th Cir. 2020. In *McCraw* the court observed that roadsides and sidewalks would not provide

a safe and direct access to the driver like the median would. The *McCraw* Court stated that, "rather, solicitors must step into the road to close the distance between drivers and themselves, making exchanges from roadsides more difficult and dangerous than those from medians. As one councilman noted while deliberating the ordinance, 'it's the entry into the street which is where all the violent impact occurs.'" 973 F.3d at 1079. The Plaintiffs use this case to conclude that "now Plaintiffs must walk directly into the street if they need to go from one side of the driveway to the other, since the Ordinance does not exempt merely passing through the zone." (Appellants Brief 65-66).

However, the Plaintiffs have other options to get from one side of the sidewalk to the other, such as going to a crosswalk or a stop light to get around to the other side of the driveway. Further, this case emphasizes the dangers that the City's Ordinance is trying to eliminate, walking into the driveway to talk to moving vehicles. (Tr. 43 at 53:10-21).

As shown above this driveway presents unique circumstances and the Ordinance has been narrowly tailored to ensure vehicular safety as well as citizens' First Amendment right to free speech. This Case has substantially different facts than the cases cited by the Plaintiffs and is not comparable to the broad sweep that Plaintiffs cases showed. Plaintiffs thus do not have a substantial likelihood of success on the merits.

## II. Plaintiffs Do Not Satisfy the Remaining Factors for a Preliminary Injunction.

### A. Irreparable Harm.

"The absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234F.3d 1163, 1176 (11th Cir App. 2000). (citing *Snook v. Trust Co. of Georgia Bank of Savannah*, N.A., 909 F.2d 480, 486 (11th Cir.1990). "The irreparable injury 'must be neither remote nor speculative, but actual and imminent." *Id*. (quoting *Northeastern Florida Chapter of Ass'n of General Contractors of America v. City of Jacksonville*, Florida, 896 F.2D 1283, 1285 (11th Cir. 1990). Notwithstanding *Elrod v. Burns*, 427 U.S. 347, 373, (1976), the assertion of First Amendment rights "does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. App. 2006) (quoting *Hohe v. Casey*, 868 F.2d 69, 72–73 (3d Cir.1989). "Rather the plaintiffs must show 'a chilling effect on free expression. *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965). "If the injury constitute[s] 'direct penalization, as opposed to incidental inhibition' of First Amendment rights the injury [cannot] be remedied absent an injunction." *Navy Seal 1 v. Austin*, 599 F.Supp.3d 1233, 1242 (FLA. M.D. 2022) (quoting *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

The Plaintiffs claim that the Plaintiffs are dutifully following the law and thus remain unable to directly leaflet to, and quietly converse with, vehicle occupants in the public driveway outside the Clinic—precisely where their communication might have its greatest impact. However, this was not true, since the Plaintiffs commonly distributed leaflets to those who parked and walked over to them. This Ordinance has not caused irreparable harm to their speech.

## B. Balance of Harms and Public Interest.

Although he entirety of the points and authorities raised above generally address these issues, combining the last two prongs of the test, it is respectfully argued that the City *will* suffer harm from being prohibited from enforcing the Ordinance and protecting public safety. Further, it simply would not serve the public interest to enjoin the Ordinance when it was adopted with the public interest as its sole goal.

## CONCLUSION

Despite their best efforts to exaggerate the true characteristics of the Ordinance, the Plaintiffs cannot establish any likelihood of success. The City's Ordinance is justified without reference to the "content" of any speech, it is "narrowly tailored" to serve the significant governmental interest of vehicular safety, and it leaves open ample "alternative channels for communication." The Plaintiffs cannot show irreparable injury and the "balancing test" clearly favors the City in

advancing public safety, The District Court Decision in Denying the Appellants

Motion for Preliminary Injunction should be Affirmed.

Date: February 2, 2024                     Respectfully submitted,

                                           /s/ Luke Lirot
                                           Luke Lirot,
                                           Florida Bar Number 714836
                                           LUKE CHARLES LIROT, P.A.
                                           2240 Belleair Road, Suite 190
                                           Clearwater, Florida 33764
                                           Telephone: (727) 536-2100
                                           Facsimile: (727) 536-2110
                                           luke2@lirotlaw.com  (primary e-mail)
                                           team@lirotlaw.com (secondary e-mail)

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
TYPEFACE REQUIREMENTS AND TYPE-STYLE REQUIREMENTS**

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 12,385 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Date: February 2, 2024

/s/ Luke Lirot
Luke Lirot
*Counsel for Appellee*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2024, I electronically filed the forgoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all parties in this case.

/s/ Luke Lirot
Luke Lirot
*Counsel for Appellee*