FOR PUBLICATION

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13501
_____

FLORIDA PREBORN RESCUE, INC.,
ALLEN TUTHILL,
ANTONIETTE M. MIGLIORE,
SCOTT MAHURIN,
JUDITH GOLDSBERRY,

*Plaintiffs-Appellants,*

*versus*

CITY OF CLEARWATER, FLORIDA,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:23-cv-01173-MSS-AAS
_____

Before NEWSOM, GRANT, and ABUDU, Circuit Judges.

NEWSOM, Circuit Judge:

Seeking to protect the safety of those driving into and out of the parking lot of a local abortion clinic, the City of Clearwater, Florida created a "vehicular safety zone."  The buffer zone applied to most pedestrians, forbidding entrance to a 38-foot stretch of public sidewalk (28 feet of which cross the clinic's driveway) during business hours.  A non-profit and four pro-life sidewalk counselors sued, challenging the buffer zone as a violation of the First Amendment, and moved for a preliminary injunction against its enforcement.  The district court denied the motion, holding that the plaintiffs were unlikely to succeed on the merits.

We disagree.  Applying the Supreme Court's decision in *McCullen v. Coakley*, 573 U.S. 464 (2014), we hold that the plaintiffs are likely to succeed on the merits of their First Amendment challenge and that the district court therefore abused its discretion in denying the preliminary injunction on that ground.  We further hold that the remaining factors clearly counsel in favor of preliminary injunctive relief.  Accordingly, we vacate the district court's judgment and remand the case with instructions that it enter the requested injunction.

## I

### A

Bread and Roses Woman's Health Center is a medical clinic located in Clearwater, Florida that performs abortions on Tuesdays, Thursdays, and Saturdays.  Florida Preborn Rescue, Inc. is a non-profit that describes its work as "pro-life" and "religiously motivated."  Br. of Appellants at 9.  Allen Tuthill, Antoniette Migliore,

and Scott Mahurin are members of Florida Preborn; Judith Goldsberry is a non-member who periodically works with or near them. All four individuals are "sidewalk counselors" who typically go to the clinic on Tuesdays and Thursdays "to have conversations on the sidewalk with, and provide literature to, patients and other persons entering and exiting medical centers providing abortion services." Order Den. Prelim. Inj., at 3–4, Dkt. No. 45. Usually, no more than two or three counselors visit the clinic on Tuesdays and Thursdays. A larger group of protesters—as distinguished from counselors—typically go on Saturdays.

Clearwater alleges that it has had issues with "protestors repeatedly crossing the driveway of the health center and impeding ingress and egress of vehicle traffic and getting within close proximity of driving cars with the intent to frighten and intimidate the vehicle occupants." Proposed Ordinance Summ., Dkt. No. 26-2. In an effort to address that issue, the city passed Ordinance No. 9665-23. *See* Ordinance, Dkt. No. 26-4. The record includes four sources of evidence about disruptions both before and after the Ordinance's enactment: (1) testimony from three police officers; (2) several videos of incidents at the clinic; (3) a report cataloguing recent police visits to the clinic; and (4) a collection of police reports. In the Ordinance's recitals, the city asserted that the problem couldn't be solved with "targeted trespass warnings" because "the driveway is located on the public right-of-way"—nor could it be tackled with "targeted arrests" because officers can't arrest violators for misdemeanors not committed in their presence and because "protesters will temporarily comply with an officer's

instructions whenever told to vacate the driveway" and then re-enter later.  Ordinance at 2.

The Ordinance reads as follows:

Section 28.10 – VEHICLE SAFETY ZONE FOR BREAD AND ROSES WOMAN'S HEALTH CENTER LOCATED AT 1560 S. HIGHLAND AVENUE.

(1) VEHICULAR SAFETY ZONE.  No pedestrian as defined in Florida Statute 316.003(56), or person riding a bicycle as defined in Florida Statute 316.003(4), or person operating any other non-motorized vehicle, shall enter into or cross any portion of the vehicular driveway located at the western entrance to the clinic, or enter that portion of the sidewalk or swale located within five (5) feet north or south of the concrete driveway.  This restriction shall be in effect only from Monday through Saturday, beginning 7:00am and ending 6:00pm each day.

This section shall not apply to police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the Clinic.

(2) PENALTY.  Any person, firm, or corporation who pleads guilty or nolo contendere, or is convicted of violating of this section shall be guilty of a Class III

civil infraction pursuant to Section 1.12 of this Code of Ordinances.

Ordinance at 2–3.

The buffer zone extends five feet on either side of the clinic's driveway, such that the full length of sidewalk covered—including the portion that crosses the driveway—is about 38 feet. Below is a picture of the clinic entrance, the white lines demarcating the buffer zone:



Pls.' Ex. #6, Dkt. No. 42-6; *see also* Order at 8.

According to the testimony of Clearwater police officers, real-world enforcement of the Ordinance diverges from its text in two respects. First, as to coverage: Although by its terms the Ordinance applies not just to counselors and protesters but to essentially all pedestrians—exempting only first responders and certain clinic personnel—officers have usually allowed ordinary passersby to go on about their business. Second, as to sanctions: Typically,

an officer will first give an individual who breaches the buffer zone a warning and, if the violation continues, issue a citation. If the individual persists in his violation even after receiving the citation, however, then, even though the law doesn't provide for criminal penalties, the officer will arrest him for obstruction.

## B

Florida Preborn and the four sidewalk counselors (collectively, Florida Preborn) challenged the Ordinance, arguing that it violates the First Amendment (both the Free Speech and Free Exercise Clauses, facially and as-applied), the Florida Constitution (facially and as-applied), and the Florida Religious Freedom Restoration Act of 1998. Florida Preborn then moved to preliminarily enjoin the Ordinance solely on First Amendment free-speech grounds, arguing that it was content-based as applied and, even if content neutral, that it failed intermediate scrutiny. The district court denied the preliminary injunction.

Before us, Florida Preborn has (for purposes of the appeal) abandoned its argument that the Ordinance is content-based as applied, leaving only a facial free-speech challenge. *See* Br. of Appellant at 5 n.2; Oral Arg. at 1:57–2:30 (explaining that this is a facial challenge).

## II

"A district court may grant preliminary injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant

outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (citation modified). The first factor is the most important, and "[w]here a court concludes that the movant fails to establish a substantial likelihood of success on the merits," it needn't reach the remaining considerations. *Barber v. Governor of Ala.*, 73 F.4th 1306, 1317 (11th Cir. 2023).

The district court held that Florida Preborn was unlikely to succeed on the merits, so it denied the preliminary injunction without reaching the remaining factors. For reasons we will explain, we disagree.[1]

## A

The First Amendment famously provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This command applies to the States—and

---

[1] "We generally review preliminary injunctions only for an abuse of discretion, but we review *de novo* the legal conclusions on which they are based." *ACLU of Fla.,* 557 F.3d at 1198. "This scope of review will lead to reversal only if the district court applies an incorrect legal standard, or applies improper procedures, or relies on clearly erroneous factfinding, or if it reaches a conclusion that is clearly unreasonable or incorrect." *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011) (citation modified). "Otherwise, an abuse of discretion standard recognizes there is a range of choice within which we will not reverse the district court even if we might have reached a different decision." *Id.* (citation modified).

therefore to municipalities like Clearwater—through the Four-teenth Amendment. *See id*. amend. XIV, § 1; *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96–98 (1972). Public sidewalks, like the one at issue here, are traditional public fora, where "the government's ability to restrict speech . . . is 'very limited.'" *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (quoting *United States v. Grace*, 461 U.S. 171, 177 (1983)). But "[e]ven in a public forum, the government may enforce regulations of the time, place, and manner of expression" that survive intermediate scrutiny—*i.e.*, those that "[1] are content-neutral, [2] are narrowly tailored to serve a significant government interest, and [3] leave open ample alternative channels of commu-nication." *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999) (citation modified). Because, again, Florida Preborn has (for present purposes) jettisoned its argument that the Ordinance is content-based, the relevant factors here are the second and third, both of which the government has the burden to prove.[2]

---

[2] Briefly, one preliminary issue: As already noted, this case (at least as it exists before us) presents a facial challenge. The Supreme Court recently reiterated the rules applicable to facial challenges in a First Amendment case arising out of this circuit. *See Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). In addressing a facial First Amendment challenge, the Court said, "the question is whether a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id*. at 723 (citation modi-fied). A reviewing court must therefore "address the full range of activities the laws cover, and measure the constitutional against the unconstitutional appli-cations." *Id*. at 724.

It's not immediately clear how the facial-challenge standard maps onto a case like this one, where the allegation, fundamentally, is that Clearwater's

## B

The district court concluded that the city "will likely be able to show" both that the Ordinance "is . . . narrowly tailored to serve a significant government interest" and that it "leaves open ample alternative channels of communication." Order at 17–23, 26–28. Respectfully, we disagree. At the very least, the Ordinance is not narrowly tailored. And because it isn't narrowly tailored, we needn't address whether it leaves open ample alternative channels.

*McCullen* is the most relevant precedent, and so we consider it in some detail. In that case, sidewalk counselors like those here sued to enjoin the enforcement of a Massachusetts statute that created buffer zones around all abortion clinics in the state—specifically, by "mak[ing] it a crime to knowingly stand on a public way

_____

ordinance is insufficiently narrowly tailored for First Amendment purposes. The Sixth Circuit, though, in a case similar to this one—in which sidewalk counselors sued to enjoin the enforcement of a 10-foot buffer zone around clinic sidewalks and driveways—explained the rule's application this way: "In facial First Amendment challenges, we consider a statute's full range of applications even when some of them do not implicate a particular plaintiff." *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 407 (6th Cir. 2022). Accordingly, the court continued, "if a statute is not narrowly tailored, it cannot be constitutionally applied to *anyone*, even if a more narrowly tailored statute might still capture a plaintiff's conduct." *Id.* That reasoning tracks our own caselaw addressing facial vagueness challenges under the First Amendment. There, we've held that "at least when vagueness is the constitutional vice," "as a logical matter, a law . . . found to be constitutionally unreasonable . . . due to lack of standards and guidance is by definition facially invalid." *Young Isr. of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth.*, 89 F.4th 1337, 1350 (11th Cir. 2024).

or sidewalk within 35 feet of an entrance or driveway to any place, other than a hospital, where abortions are performed." *Id.* at 469, 475 (citation modified). As relevant here, the counselors brought a facial free-speech challenge under the First Amendment, which both the district court and the First Circuit rejected, upholding the statute as a reasonable "time, place, and manner" regulation. *Id.* at 475 (citing *Ward v. Rock Against Racism*, 491 U.S. 781 (1989)).

The Supreme Court reversed. *Id.* at 497. Despite holding that the statute was content-neutral and therefore subject only to intermediate scrutiny, *id.* at 478–85, the Court invalidated it on the ground that it wasn't narrowly tailored, *id.* at 486–97. In explaining the narrow-tailoring test, the Court observed that, "[f]or a content-neutral time, place, or manner regulation to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 486 (quoting *Ward*, 491 U.S. at 799). The Court said that while the law "'need not be the least restrictive or least intrusive means of' serving the government's interests," the government "'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" *Id.* (quoting *Ward*, 491 U.S. at 798–99).

The Court then set about applying that standard. As an initial matter, it identified the two inputs that inform any narrow-tailoring analysis: the government's regulatory interest and the nature of the speech at issue. *Id.* at 486–90. The buffer zone, the Court observed, "clearly serve[d]" the government's interest in

ensuring "public safety, patient access to healthcare, and the unob-structed use of public sidewalks and roadways." *Id.* at 486 (citation modified). "At the same time," the Court emphasized, the statute "serious[ly] burden[ed]" the counselors' "two primary methods of communicating with patients": (1) "initiat[ing] [] close, personal conversations"; and (2) "distribut[ing] literature to arriving pa-tients." *Id.* at 487–88.

Having identified the inputs, the Court proceeded to apply the narrow-tailoring test, which, again, asks whether a challenged law "burdens substantially more speech than necessary to achieve the [government's] asserted interests." *Id.* at 490. It held that the Massachusetts statute did so for two independent reasons. First, "the [government] ha[d] too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which petitioners wish to engage." *Id.* at 490. And second, "[f]or a problem shown to arise only once a week in one city at one clinic"—there, the evidence of disturbances cen-tered on a single facility in Boston—"creating 35-foot buffer zones at every clinic across the [state was] hardly a narrowly tailored so-lution." *Id.* at 493. Because the statute at issue in *McCullen* bur-dened substantially more speech than necessary to advance the government's concededly legitimate interest in public safety, the Court held that it wasn't narrowly tailored and thus violated the First Amendment. *Id.* at 486–97.

## C

The district court here endeavored to apply *McCullen*. It began by recognizing that "vehicular safety" is a significant government interest and that the Ordinance promotes that interest. Then, though, it skipped straight to the question whether Clearwater had "considered potentially less restrictive alternatives." Order at 19–20. The remainder of the court's narrow-tailoring analysis focused on factual comparisons between the circumstances presented by this case and those in which courts had enjoined buffer zones, *see McCullen*, 573 U.S. at 469, 493; *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 402–07 (6th Cir. 2022), or upheld them, *see Lucero v. Trosch*, 121 F.3d 591, 605–06 (11th Cir. 1997); *Bruni v. City of Pittsburgh*, 941 F.3d 73, 77–78, 90 (3rd Cir. 2019).

We think it best to wed ourselves closely to the analysis established in *McCullen*. In doing so, we take guidance from a sister circuit's decision that applied *McCullen* in assessing sidewalk counselors' facial First Amendment challenge to a 10-foot buffer zone. *See Sisters for Life*, 56 F.4th at 404–08.

### 1

First up, the two narrow-tailoring inputs. Our evaluation of the government's interest is straightforward. Here, as in *McCullen*, the government asserts an interest in vehicular safety—that is, the safety of both pedestrians and drivers as cars enter and exit the clinic. In the Ordinance's recitals and in Clearwater's filings before both the district court and us, the city has repeatedly invoked its interest in protecting safe ingress and egress at the clinic. *See*

Ordinance at 2 ("WHEREAS, this buffer zone will ensure the safety of protesters and patients alike, by allowing safe vehicular ingress and egress to and from the clinic"); Response in Opp'n to Mot. for Prelim. Inj., at 9, 19, Dkt. No. 26 (describing the "significant governmental interest" as "providing safe and unobstructed access to this Clinic" and as "vehicular safety"); Br. of Appellees at 19 ("[T]he City has a significant governmental interest in providing safe and unobstructed access to this Clinic, as it would for any driveway,"); *see also* Order at 18 ("The City asserts vehicular safety as its significant government interest."). This is clearly a qualifying government interest. As the Supreme Court recognized in *Schenck v. Pro-Choice Network of Western New York*, the government has a legitimate interest in "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services." 519 U.S. 357, 376 (1997). *McCullen* held that "buffer zones clearly serve these interests," 573 U.S. at 487, and Florida Preborn wisely hasn't contended otherwise.

"At the same time," though, as the *McCullen* Court said, the Ordinance seriously burdens Florida Preborn's speech—here, as there, by restricting the sidewalk counselors' ability to distribute leaflets to patients as they arrive at the clinic. *Id.* at 487–88. Explaining exactly how and why will take a bit of doing. Let's first take a close(r) look at *McCullen*. The Supreme Court there recognized two forms of expression that "have historically been [] closely associated with the transmission of ideas": (1) "normal conversation" and (2) "leafletting on a public sidewalk." *Id.* at 488. It

explained that "[w]hen the government makes it more difficult to engage in these modes of communication, it imposes an especially significant First Amendment burden." *Id.* at 489. The Court then held that the buffer zone at issue seriously burdened both forms of expression, which it recognized were the sidewalk counselors' "two primary methods of communicating with patients." *Id.* at 488.

First, the Court observed that the statute "compromise[d] petitioners' ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling'" by making it difficult to identify patients before they entered the buffer zone, by making sidewalk counselors appear "untrustworthy" because they had to stand behind a "painted border," and by reducing them to "raising [their] voice[s] at patients from outside the zone." *Id.* at 487. In response to the state's argument that the petitioners could still chant slogans and display signs from outside the buffer zone, the Court said it "misse[d] the point" that the petitioners were sidewalk counselors, not protesters: "If all that the women can see and hear are vociferous opponents of abortion, then the buffer zones have effectively stifled petitioners' message." *Id.* at 489–90.

Second, the *McCullen* Court emphasized that the statute at issue "made it substantially more difficult for petitioners to distribute literature to arriving patients" because sidewalk counselors couldn't identify pedestrian patients before they entered the zone, and because they could "no longer even attempt to offer literature as drivers turn[ed] into the parking lots." *Id.* at 488. The Court

particularly emphasized the buffer zone's restriction on the petitioners' "right to stand on the public sidewalks by the driveway as cars turn[ed] into the parking lot." *Id.* at 490.

Florida Preborn contends that, just as in *McCullen*, Clearwater's ordinance burdens their speech interests in (1) close communication and (2) leafletting. We agree, at least as to its interest in delivering literature to clinic patients—and because we find a serious burden there, we needn't separately consider Florida Preborn's close-conversation interest.[3]

Florida Preborn has provided "uncontradicted testimony" that the buffer zone has effectively stifled sidewalk counselors'

---

[3] The record regarding Florida Preborn's close-conversation interest is mixed. To be sure, Mahurin testified that the "painted line" discourages clinic patients from "com[ing] over to talk to" them, "forces [them] to shout," and prevents patients from "see[ing] the kindness in [their] faces." Prelim. Inj. Mot. Hr'g Tr., 47:2–11, Dkt. No. 43. And Tuthill also emphasized the importance of "being able to be heard in a normal tone of voice and not from a far away distance" and of demonstrating a "body language" of "concern" that is harder to communicate over a distance. *Id.* at 74:23–75:12, 78:14–18; 81:8–12. The district court, though, made several findings to the contrary. In particular, it determined that "[t]he Ordinance does not prevent Plaintiffs from speaking in whatever tone or level they choose to use" and that "[t]he evidence demonstrated that, without amplification and while speaking in normal tones, Plaintiffs can be heard five feet away." Order at 11. For support, the court pointed to an in-court demonstration showing that the sidewalk counselors' voices could "carry an additional five feet to attract the attention of an individual." *Id.* In any event, we needn't definitively resolve this question today because, for reasons we will explain, the Ordinance burdens Florida Preborn's leafletting substantially more than is necessary to protect the safety of pedestrians and vehicles as cars enter and exit the clinic's parking lot.

ability to distribute literature to patients entering and exiting the clinic. *McCullen*, 573 U.S. at 487–88. Migliore, for instance, testified that before the Ordinance's adoption, she could—and did—briefly walk into the portion of the sidewalk crossing the clinic's driveway to hand literature to occupants of cars if they stopped and rolled down their windows, but that she can no longer do so. *See* Prelim. Inj. Mot. Hr'g Tr., 101:23–102:13, 120:5–11, Dkt. No. 43. Mahurin likewise said that he had previously handed leaflets directly to cars' occupants, but that the Ordinance now prevents him from doing so. *Id.* at 37:25–38:11, 59:23–61:5. So too, in their declarations, Tuthill and Goldsberry testified that Florida Preborn members used to step into the "public right-of-way area of the driveway" when vehicles stopped to "briefly converse" with the occupants— "one of [their] main activities at the Clinic"—but that it is now "impossible for [them] to hand any leaflets to people in cars entering the Clinic." Tuthill Decl., ¶¶ 8–11, Dkt. No. 16-1; *see also* Goldsberry Decl., ¶ 15, Dkt. No. 16-6 ("Due to the Ordinance and the buffer zone it creates, it is impossible for sidewalk counselors to distribute leaflets to people in vehicles entering or exiting the Clinic[,]" which "has been one of our main activities at the Clinic . . . .").

    Photographs in the record confirm the witnesses' testimony that cars entering and exiting the clinic are now out of the reach of counselors standing behind the buffer-zone lines. *See* Pls.' Ex. #12, Dkt. No. 42-12; Pls.' Ex. #19, Dkt. No. 42-19. And that matters because, as the city admitted at the preliminary-injunction hearing, most patients arrive at the clinic by car. *See* Hr'g Tr., 20:19–21:10.

The closest the city (or the district court) has come to contradicting Florida Preborn's testimony is by pointing to a post-Ordinance incident in which a clinic patron parked and then approached the sidewalk counselors—but he did so to assault a counselor, not to receive literature.[4]

The district court made no contrary findings about Florida Preborn's leafletting activity. To be sure, the district court faulted Florida Preborn for "not keep[ing] track of leaflets numerically and thus" not being able to "definitively quantify any purported decline." Order at 13. But the Supreme Court didn't require that level of precision in *McCullen*. To the contrary, it emphasized one counselor's "estimate[s]," another's claim that "she reaches 'far fewer people' than she did before the amendment," and another's testimony that after the buffer zone went into effect "only one woman out of 100 will make the effort to walk across [the street] to speak with [her]." 573 U.S. at 487–88. And while the district court here noted Tuthill's testimony that "he had stopped trying to distribute leaflets altogether," Order at 13, others clearly testified that they continue to attempt to pass out literature, *see* Prelim. Inj.

---

[4] On appeal, the city asserts that "the Plaintiffs did not commonly distribute leaflets to the vehicles from the sidewalk." Br. of Appellees at 24–26. And it's true that Tuthill testified that the 50 or 60 pamphlets he handed out before the Ordinance's adoption were to people who parked and then walked up to him, *see* Hr'g Tr. at 65:7–12, 66:8–15, and that a Florida Preborn witness said that Goldsberry was "not as engaging with the women going in," *id.* at 43:6–9, 44:11–17. But that doesn't account for the other witnesses who testified (as described above the line) that they distributed leaflets and briefly spoke with vehicles' occupants.

Mot. Hr'g Tr., 33:6–11, 101:13–20, Dkt. No. 43.  Finally, the district court observed that the "Ordinance continues to permit [the counselors] to wave leaflets" and to "pass[] leaflets to persons" who venture across the buffer zone's line.  Order at 13, 28.  But that's the very sort of argument the *McCullen* Court rejected.  *See* 573 U.S. at 489 ("It is easier to ignore a . . . waving hand than . . . an outstretched arm.").

Separately, it remains the case that, by its terms, the Ordinance forbids a clinic patient who has parked her car to approach sidewalk counselors to receive a leaflet.  It prohibits all "pedestrian[s]" from "enter[ing]" the buffer zone for any reason—conspicuously exempting only clinic employees "engaged in assisting patients and other persons to enter or exit the Clinic" and various first responders, but *not* clinic patients.  Ordinance at 2–3.  The district court concluded that the "assisting" exemption "implicitly cover[s]" "patients and other persons" entering or exiting the clinic on foot, Order at 6 n.2; *see also id.* at 13 ("[N]othing in the Ordinance prohibits someone who wants a leaflet from walking up to [Tuthill] to retrieve a leaflet."), but the Ordinance's plain text belies that reading.  Again, the Ordinance expressly lists exceptions to its general prohibition—but "patients and other persons" aren't among them.  *See* Ordinance at 2–3.  The more natural reading, supported by record evidence, is that the "patients and other persons" to which the "assisting" exception refers are those arriving by car.  Photographs in the record depict clinic "[e]scorts" in the buffer zone directing cars into the clinic parking lot.  *See* Pls.' Ex. #14, Dkt. No. 42-14; Pls.' Ex. #15, Dkt. No. 42-15; Pls.' Ex. #16, Dkt. No. 42-

16; Pls.' Ex. #17, Dkt. No. 42-17; Pls.' Ex. #18, Dkt. No. 42-18; Pls.' Ex. #19, Dkt. No. 42-19.   And the fact that police officers have opted not to enforce the Ordinance's plain terms against some pedestrians, *see supra* at 5, is neither here nor there.   Because this is a facial challenge, "we must analyze [the Ordinance] as written." *Redner v. Dean*, 29 F.3d 1495, 1501 (11th Cir. 1994).

**2**

On, then, to the application of *McCullen*'s narrow-tailoring analysis.  We think it clear that the Ordinance burdens substantially more speech—namely, the sidewalk counselors' leafletting activities—than is necessary to achieve the government's asserted interest in promoting vehicular safety.  *See McCullen*, 573 U.S. at 490. *McCullen* recognizes two ways in which a law can burden substantially more speech than necessary, each of which independently suffices as a basis for invalidation.  First, the law does so if the government can't show "that it seriously undertook to address the problem with less intrusive tools readily available to it"—that is, the government hasn't adequately considered "alternative measures."  *Id.* at 490, 494–95.  Second, it does so—regardless of the availability of alternate measures—if there's a material mismatch between the regulation's breadth and the interests the government seeks to advance.  *See id.* at 493; *see also Sisters for Life*, 56 F.4th at 405 (referring to this as the "breadth of the regulation" inquiry).

Dispositively here, the city failed to adequately consider alternative measures.[5]  For this part of *McCullen*'s narrow-tailoring analysis, the plaintiff bears the burden to provide, in the record, "evidence of [such] feasible alternatives."  *Pine v. City of W. Palm Beach*, 762 F.3d 1262, 1274 (11th Cir. 2014).  The government can then rebut by demonstrating that "alternative measures that burden substantially less speech would fail to achieve [its] interests."  *McCullen*, 573 U.S. at 495.  Importantly, though, it isn't enough for the government merely to show that its "chosen route is easier" or more "efficien[t]."  *Id.*

With respect to alternative measures, *McCullen* is very nearly on point.  The Supreme Court found it fatal that the state "ha[d] too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which [the plaintiffs] wish[ed] to engage."  *Id.* at 490.  In particular,  the government there, as here, sought (among other things) to address "a substantial public safety risk created when protesters obstruct driveways leading to the clinics."  *Id.* at 492.  The Court concluded, though, that the state had "fail[ed] to look to less intrusive means of addressing its concerns."  *Id.*  In particular, the Court said that "[a]ny such obstruction c[ould] readily be addressed through existing local ordinances."  *Id.* (first quoting Worcester, Mass., Rev. Ordinances of 2008, ch. 12, § 25(b) ("No person shall stand, or place

---

[5] Accordingly, we needn't decide whether there is a fatal mismatch between the regulation's breadth and the government's asserted interest in vehicular safety.

any obstruction of any kind, upon any street, sidewalk or crosswalk in such a manner as to obstruct a free passage for travelers thereon."); and then quoting Bos., Mass., Mun. Code, ch. 16–41.2(d) (2013) ("No person shall solicit while walking on, standing on or going into any street or highway used for motor vehicle travel, or any area appurtenant thereto (including medians, shoulder areas, bicycle lanes, ramps and exit ramps).")).

Florida currently has a law on the books that is materially identical to the anti-obstruction laws that the *McCullen* Court cited as exemplars: "A person may not willfully obstruct the free, convenient, and normal use of a public street, highway, or road by . . . [i]mpeding, hindering, stifling, retarding, or restraining traffic or passage thereon . . . ." Fla. Stat. § 316.2045(1)(a)(1). Notably for present purposes, the Florida law expressly defines "[s]treet or highway" as "[t]he entire width between the boundary lines of every way or place of whatever nature when any part thereof is open to the use of the public for purposes of vehicular traffic." *Id.* § 316.003(90)(a).

The district court and the city have offered a handful of bases for distinguishing the alternative-measures analysis here from that in *McCullen*. Respectfully, we find none of them persuasive. *First*, the district court repeatedly said that the clinic's driveway isn't "public." Even assuming those statements to be factual findings subject to clear-error review, *see Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011), they cannot stand. The Ordinance's own description of the driveway states that it is

"located on the public right-of-way." Ordinance at 2. And the aerial map of the lot attached to the Ordinance confirms that the clinic's lot doesn't extend to the part of the driveway crossed by the sidewalk, meaning that the land at issue is indeed publicly owned. *See id.* at 5.

*Second*, the city asserts that the driveway is not "considered by the Clearwater Police Department to be a 'road or highway'" within the meaning of the Florida statute. Br. of Appellee at 34–35. But whatever individual officers might have said about their own subjective (and inconsistent) understandings, *compare, e.g.*, Hr'g Tr. at 177:16–178:5 (statute doesn't apply), *and id.* at 187:22–25 (statute doesn't apply), *with, e.g., id.* at 178:24–179:12 (statute applies), what matters here—on a facial challenge—is that the statute applies by its terms. As just explained, the law's definition of "[s]treet or highway" is quite broad—certainly broad enough to cover driveways on public property. *See* Fla. Stat. § 316.003(90)(a).

*Third*, both the district court and the city say that the legitimate vehicular-safety interests can't be addressed through "after the fact" citation mechanisms like a statute criminalizing obstruction. Br. of Appellee at 33; Order at 19–20. The problem, of course, is that the Ordinance likewise provides only for after-the-fact citations and (on its face, anyway) doesn't even provide a mechanism for arresting violators.

*Finally*, the city asserts that enforcement of the existing anti-obstruction statute would be "significantly more tedious and less efficient." Br. of Appellees at 36. But that is precisely the kind of

argument that the Court in *McCullen* rejected: The government, the Court said, must show that an alternative enforcement mechanism "would fail to achieve the government's interests" entirely, "not simply that the chosen route is easier." 573 U.S. at 495; *see id.* ("A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency."). And the city hasn't argued that enforcing the existing statute would altogether fail to achieve its interests.[6]

---

[6] The city separately asserts that Florida's anti-obstruction statute "has had a history of being found unconstitutional." Br. of Appellees at 35. That is technically correct—but misleading. The lone authority the city cites is an order on a motion to dismiss that found that "Plaintiffs ha[d] plausibly alleged that the amended version of section 316.2045 . . . is arguably overbroad." *Dream Defenders v. DeSantis*, 553 F. Supp. 3d 1052, 1098 (N.D. Fla. 2021). That case was voluntarily dismissed, *see* Order for Dismissal, *Dream Defenders v. DeSantis*, No. 4:21CV00191, Dkt. No. 200 (N.D. Fla. Nov. 6, 2024), after this Court reversed an order preliminarily enjoining a different provision, *see Dream Defenders v. Governor of Fla.*, 119 F.4th 872, 874–75 (11th Cir. 2024). And while it's true that two district courts have held § 316.2045 unconstitutional on various First Amendment grounds, *see Bischoff v. Florida*, 242 F. Supp. 2d 1226, 1235–38 (M.D. Fla. 2003); *Vigue v. Shoar*, 494 F. Supp. 3d 1204, 1222–25 (M.D. Fla. 2020), virtually all the offending language has since been excised from the statute. *Compare* Fla. Stat. § 316.2045 (1996) (held unconstitutional by *Bischoff*), and *id.* (2007) (held unconstitutional by *Vigue*), *with id.* (2021) (current version). The only potentially troublesome text that remains is the single word "[s]tanding," which *Bischoff* faulted for its vagueness. 242 F. Supp. 2d at 1236. But the amended statute clarifies that term in precisely the way recommended by the district court. *Compare id.* ("Section one is ambiguous as to whether it is unlawful for an individual to willfully obstruct the free use of the road 'by standing,' or whether she must do so by standing on the road."), *with* Fla. Stat. § 316.2045(1)(a)(2) (2021) ("Standing on or remaining in the street, highway,

\*   \*   \*

In closing, an important coda: It isn't lost on us, of course, that the buffer zone invalidated in *McCullen* was much larger than the one at issue here—35 feet on either side of a clinic's driveway, rather than just 5. That fact is undeniable. Even so, we don't think it dictates a different analysis or result. Size alone didn't drive the Supreme Court's decision there—principle did. The statute's chief failing wasn't, as such, that it kept the counselors 35 feet back, but rather that, however far it kept them back, it prevented them from (as relevant here) offering literature to clinic patients as they arrived. The Supreme Court noted, for instance, that several petitioners there claimed a right that mirrors the one that the counselors here claim—namely, to stand "where the private walkway or driveway intersects the sidewalk and offer leaflets to patients as they walk or drive by," or to "position [themselves] at an entrance to one of the five driveways leading to the parking lots." 573 U.S. at 474. And the Court's analysis was trained less on the buffer zone's sheer scope than on the zone's infringement (whatever its size) of that claimed right. *See id*. at 487 ("[T]he zones carve out a significant portion of the adjacent public sidewalks, pushing petitioners well back from the clinics' entrances and driveways. The

_____

or road."). Of course, it's not our task here to adjudicate the constitutionality of § 316.2045, which isn't under review. Suffice it to say that so far as we are aware, no part of the current version of the statute has ever been deemed invalid for any reason.

zones thereby compromise petitioners' ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling.'"); *id.* at 488 ("The buffer zones have also made it substantially more difficult for petitioners to distribute literature to arriving patients."); *id.* ("[T]he zones have pushed petitioners so far back from the clinics' driveways that they can no longer even attempt to offer literature as drivers turn into the parking lots."); *id.* at 489 ("When the government makes it more difficult to engage in these modes of communication, it imposes an especially significant First Amendment burden.").

The Sixth Circuit's post-*McCullen* decision in *Sisters for Life* is illuminating. There, in holding that a local ordinance establishing a 10-foot buffer zone around the sidewalks leading to clinic entrances was likely unconstitutional, the court said this: "That the buffer zone in *McCullen* was larger does not change things." *Sisters for Life*, 56 F.4th at 407. *McCullen*, the Sixth Circuit explained, "does not create distinct sets of rules for a 35-foot buffer zone near an entrance, a 10-foot buffer zone near an entrance, and all manner of buffer zones in between," but rather holds "that narrow tailoring is required for *all* such burdens on speech." *Id.* (emphasis added). Accordingly, the court concluded—however large or small, and "whether its yoke is heavy or light"—"[o]nce a buffer zone burdens speech, *McCullen* demands narrow tailoring." *Id.* Indeed, the Sixth Circuit seemed to think it constitutionally significant that the ordinance at issue there kept sidewalk counselors "more than an arm's length away" from clinic patients, and thereby frustrated the counselors' protected leafletting activities. *Id.* at 406; *accord id.* at 407

("[T]he buffer zone suppresses speech . . . since distribution now takes place beyond an arm's length . . . .").[7]

Under *McCullen*, the controlling question is whether the challenged buffer zone—be it five, 10, or 35 feet—burdens substantially more speech than necessary to achieve the government's asserted interests. We think it likely that Clearwater's buffer zone does so.

## III

Because the district court rejected Florida Preborn's preliminary-injunction request at the first step, it had no occasion to

---

[7] Our own post-*McCullen* decision in *Pine* is of a piece. That case dealt with an ordinance that forbade loud sounds within 100 feet of healthcare facilities. Even so, we methodically marched through the *McCullen* analysis. *Pine*, 762 F.3d at 1269–74.

   Lastly, a coda to the coda: As did the district court, Clearwater points to cases that have upheld larger buffer zones than the one at issue here. Two of those cases, though—*Lucero* and *Schenck*—involved targeted injunctions rather than generally applicable laws. *See Lucero*, 121 F.3d at 601; *Schecnk*, 519 U.S. at 371. And the *McCullen* Court explicitly distinguished injunction-related cases in its analysis. *See* 573 U.S. at 492 ("We have previously noted the First Amendment virtues of targeted injunctions as alternatives to broad, prophylactic measures."). In particular, the Court explained there that "an injunction 'regulates the activities, and perhaps the speech, of a group,' but only 'because of the group's past *actions* in the context of a specific dispute between real parties,'" while a law, like the Ordinance here, "categorically excludes non-exempt individuals from the buffer zones, unnecessarily sweeping in innocent individuals and their speech." *Id.* at 492–93 (quoting *Madsen v. Women's Health Ctr. Inc.*, 512 U.S. 753, 762 (1994)). A third case, *Bruni*, is irrelevant because it concerned a law that did "not prohibit the sidewalk counseling in which Plaintiffs seek to engage within the zone." 941 F.3d at 85.

address the remaining factors. Even so, we think it sensible to address and resolve them here. The relevant facts are undisputed; the second, third, and fourth factors have been "fully briefed and argued by the parties"; and their resolution—in the light of our holding that Florida Preborn is likely to succeed on the merits—is clear. *See Metheny v. Hammonds*, 216 F.3d 1307, 1311 n.12 (11th Cir. 2000).

The irreparable-injury factor favors preliminary-injunctive relief. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). True, we have held that only "direct penalization"—as opposed to "incidental inhibition"—of "First Amendment rights constitutes irreparable injury." *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983). But the Ordinance "categorically bars" Florida Preborn's speech by prohibiting sidewalk counselors from using a public sidewalk to distribute literature. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

The balance-of-harms and public-interest factors "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), and likewise counsel in favor of preliminary-injunctive relief. "[E]ven a temporary infringement of First Amendment rights constitutes a serious and substantial injury, and the city has no legitimate interest in enforcing an unconstitutional ordinance." *KH Outdoor*, 458 F.3d at 1272.

## IV

For the foregoing reasons, we conclude that Florida Preborn has a substantial likelihood of establishing that the Ordinance is not narrowly tailored. Accordingly, we hold that the district court abused its discretion in denying the preliminary injunction on the ground that Florida Preborn hadn't established a likelihood of success on the merits, and we **VACATE** the district court's judgment. And because the remaining preliminary-injunction factors straightforwardly counsel in favor of granting preliminary-injunctive relief, we **REMAND** to the district court with instructions that it enter the requested injunction.

**VACATED** and **REMANDED**.

ABUDU, Circuit Judge, Dissenting:

Preliminary injunctions are a drastic remedy that require the movant to demonstrate four requisites before the court can afford relief. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*). The movant must show that she: (1) has substantial likelihood of success on the merits, (2) will suffer irreparable harm if the court does not grant an injunction, (3) will suffer a threatened injury which outweighs damages the nonmovant will suffer, and (4) does not request an injunction that would not go against public interests. *Id.*

I respectfully dissent from the majority opinion because Florida Preborn Rescue, Inc. ("FPR") has not established a likelihood of success on the merits of their challenge against the City of Clearwater's ordinance, which created a mere five foot buffer zone between leafleteers and patients seeking reproductive care in response to law enforcement's repeated requests for more effective policing in the area. Specifically, FPR has not met its high burden of showing that the ordinance is unconstitutional under most circumstances, that it is not sufficiently narrowly tailored, and that the ample means available for communicating FPR's message are insufficient. Additionally, FPR fails to show it will incur irreparable harm or that granting an injunction is in the public's interests. For these reasons, the district court's order denying the preliminary injunction should be affirmed.

## I.     The Proper Framework for Facial Constitutional Challenges as Articulated in *Moody*

This Court reviews a lower court's decision "to deny a pre-liminary injunction for abuse of discretion" and, in doing so, re-views "findings of fact of the district court for clear error and legal conclusions *de novo*." *Scott v. Roberts*, 612 F.3d 1279, 1289 (11th Cir. 2010); *see also Lucero v. Trosch*, 121 F.3d 591, 605–06 (11th Cir. 1997) ("[W]e will defer to the district court's 'reasonable assessment' of the number of feet necessary to ensure that access to the [c]linic is not impeded."); *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002) (explaining that a district court's "judgments . . . about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make and we will not set them aside unless the district court has abused its discretion in making them").

Facial constitutional challenges are necessarily "hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024); *see also In re: Georgia Senate Bill 202*, __F.4th__, 2025 WL 3440334, at *2 (11th Cir. Dec. 1, 2025). Typically, a plaintiff's facial challenge only suc-ceeds if they "establish[] that no set of circumstances exists under which the [challenged law] would be valid, *i.e.*, that the law is un-constitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (internal quotation marks and citations omitted). In *Moody*, the Court slightly relaxed its "no set of circumstances" test to allow courts to strike down laws that impact a substantial amount of speech, "[b]ut that is so *only if* the law's unconstitutional applications substantially

23-13501                ABUDU, J., Dissenting                3

outweigh its constitutional ones." 603 U.S. at 723–24 (emphasis added). *Moody* was careful to identify the flaws in lower court opinions, including some of our own, in which we failed to address the "full range of activities the laws cover, and measure the constitutional against the unconstitutional applications." *Id*. at 724. As the Court admonished, we had been treating facial challenges more like as-applied claims. *Id*. Unfortunately, the majority in this case has made that same error—again. Regardless, the "unconstitutional under *most* circumstances" test still places the burden on the FPR to show that the City's narrow tailoring and alternative channels of communication are more constitutionally flawed than favored. *See id* at 23 (relaxing the burden for First Amendment facial challenges but not shifting that burden away from plaintiffs).

When engaging in the balancing test the Court set forth in *Moody*, we must follow a two-step process. First, we should assess the scope of the City's ordinance, including the activities it covers, the parties impacted, the law's specific prohibitions, and what other conduct it regulates. *Id*. Second, we must "decide which of the laws' applications violate the First Amendment," and then "measure them against the rest." *Id*. at 725. As to the measuring part, our mandate is to compare the law's permissible and impermissible applications and then determine whether the ordinance principally regulates expressive conduct in an unconstitutional manner or has a sphere of other applications that prevent facial invalidation. *Id*. at 726. The majority skips this part entirely, apparently because it viewed these prerequisites as easily bypassed if the case hinges on narrow tailoring. However, *Moody* dictates that

there is no bypassing the elements of analysis: "[I]n the First Amendment context, facial challenges are disfavored, and neither parties nor courts can disregard the requisite inquiry into how a law works in all of its applications." *Id*. at 744.

## II.    The City of Clearwater Satisfies the *Moody* Test

Even assuming there are some unconstitutional aspects to the City's ordinance, which there do not appear to be, there are still constitutional applications of the law that undercut FPR's facial challenge.  It is undisputed that the City has an interest in "providing safe and unobstructed access to [the] clinic, as it would for any driveway."  Both precedent and the majority agree such an interest exists and is substantial.  *See Lucero*, 121 F.3d at 607 (recognizing a "significant" government interest in "promoting the free flow of traffic on public streets"); *see also McCullen v. Coakley*, 573 U.S. 464, 486–87 (2014) (recognizing the government's interest in "ensuring . . . a woman's freedom to seek pregnancy-related services")*; Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) (acknowledging the government has an interest in protecting "public safety and order"); *Schenck v. Pro-Choice Network*, 519 U.S. 357, 376 (1997) (same).

In the district court, the City proffered evidence that the Ordinance achieved their substantial and lawful interests in safe access to the clinic.  It introduced the testimony of multiple police officers who described how FPR volunteers and protestors were obstructing access to the clinic and creating public disturbances, which is why law enforcement championed the Ordinance's passage.  The

City proffered an incident report showing 73 calls to the Clearwater Police Department ("CPD") from the clinic from January 2022 to January 2023. CPD responded to those calls involving "continuing and recently escalating confrontation," during which CPD "observed protest[e]rs repeatedly crossing the driveway of the health center and impeding ingress and egress of vehicle traffic and getting within close proximity of driving cars with the intent to frighten and intimidate the vehicle occupants." Officers testified that after the ordinance was adopted in March 2023, safety remarkably improved and, as the district court noted, FPR did not offer any evidence to the contrary. As law enforcement further emphasized, FPR's activities created a safety risk for themselves, patients, clinic staff, and police officers.

The City created the buffer zone in response to the aggressive and confrontational interactions between FPR volunteers and the clinic's patients and their volunteer escorts; consistent calls to the CPD to respond to the "escalating confrontation[s]" at the clinic; and the police's experience that trespass warnings would not suffice because the clinic's driveway is on a public right-of-way. There is no question from the record that the substantial interests the City articulated were indeed its bases for enacting the Ordinance.

Despite its lawful applications, the majority concludes that the Ordinance was too burdensome. They heavily rely on *McCullen* to support that view. The main argument appears to be that, because the leafleteers cannot cross the five foot buffer zone, FPR is

completely unable to communicate its message with patients as the group cannot offer them literature or sidewalk counseling. Those types of allegations are the precise reason why, as the Supreme Court has reminded us, striking a law down as facially unconstitutional is such a high burden which requires a strong showing regarding the encroachment on free speech rights. It is ultimately why the law allows for some leeway in terms of free speech restrictions, so long as the message can still be delivered in a way that does not upset the balance of interests *Moody* requires courts to weigh. *See Lucero*, 121 F.3d at 605 ("As a matter of common sense, this provision does not seem unreasonable and does not burden more speech than necessary. . . . The defendants can still express their message, but they must stand more than 25 feet from the [c]linic."). Therefore, our analysis is only complete when we consider the unlawful ways in which the Ordinance could be enforced and find that they "substantially outweigh" the lawful applications. *See Moody*, 603 U.S. at 724.

FPR does not endure a substantial burden on its rights to close communication or leafletting like the plaintiffs in *McCullen*. There, the Court found the buffer zone "carve[d] out a significant portion of the adjacent public sidewalks, pushing petitioners well back from the clinics' entrances and driveway" and, in doing so, impacted the protestors' ability to engage in "close, personal conversations." 573 U.S. at 466. Here, the buffer zone is only five feet and the adjacent sidewalk area and the remaining portions of the driveway remain available. FPR counselors testified that their

voices could carry the additional five feet to communicate with an individual inside the buffer zone.

As to their leafletting, the majority suggests that FPR has been seriously burdened because the Ordinance demands five feet of space. It says that, under *McCullen*, it is not sufficient that the Ordinance permits FPR to wave leaflets and offer them from a reasonable distance. However, neither our Court nor the Supreme Court has said the requisite distance for leafletting is less than five feet. In *Hill v. Colorado*, the plaintiff challenged a Colorado statute that restricted sidewalk counselors from coming within 8 feet of an individual who had not given consent to accept literature. 530 U.S. 703, 707 (2000). The Court considered "whether [] Colorado['s] [leafletting restriction] reflect[ed] an acceptable balance between the constitutionally protected rights of law-abiding speakers and the interests of unwilling listeners." *Id.* at 714. The Court held that it did. *Id.* at 718, 735.

Of course, the First Amendment protects the right to leaflet, including even messages that are offensive to the recipient. *Id.* at 714. However, there are limits to that principle. The Supreme Court has explained there is a "recognizable privacy interests in avoiding unwanted communication." *Id.* at 716. Specifically, "the First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political [messages]." *Id.* at 716 (quoting *Madsen v. Women's Health Ctr. Inc.*, 512 U.S. 753, 772-73 (1994)). Indeed, the "right to be let alone" is one of the most comprehensive of rights and the right most

valued by civilized men." *Id.* at 716 (citation omitted). Thus, the "right to be let alone" must be balanced against "the right of others to communicate." *Id.* at 718 (quoting *Rowan v. United States*, 397 U.S. 728, 738 (1970)). This is especially true when an unwilling listener is in a situation where "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." *Id.* at 718 (citation omitted).

In striking the balance, *Hill* still carefully examined the importance of leafletting. Admittedly, prohibitions on leafletting can be serious, especially where leafleteers are restricted to a certain distance. *See id.* at 727 ("The burden on the ability to distribute handbills is more serious because it seems possible that an 8—foot interval could hinder the ability of a leafleteer to deliver handbills to some unwilling recipients."). However, Colorado's restriction passed constitutional muster because it allowed leafleteers to "stand near the path of oncoming pedestrians and proffer[] his or her material, which the pedestrians can easily accept." *Id.* The ability to "easily accept" the speaker's message is the key factor. Indeed, the First Amendment protects the right of every citizen to 'reach the minds of *willing* listeners and to do so there must be opportunity to win their attention." *Id.* at 728 (emphasis added) (quoting *Kovacs v. Cooper,* 336 U.S. 77, 87 (1949)). Thus, leafleteers are entitled to present themselves and their cause in hopes of a positive interaction. However, it is the responsibility of courts and then law enforcement to protect a passerby's right to breathing room when a leafleteer is trying to win her attention by invading her personal space. *See id.*

Thus, Clearwater's Ordinance operates in harmony with the Supreme Court's guidance in both *Hill* and *McCullen*. As for the size of the buffer zone, it is difficult to even visualize how a distance of five feet seriously burdens FPR's ability to leaflet and otherwise communicate with those entering the clinic. Importantly, there is sufficient breathing room to try to win a driver's attention, even if cars continue their route without engaging FPR volunteers. The record shows that counselors wait in brightly colored vests at the edge of the driveway, offering materials to patients driving into the clinic. If the patients desire, they can stop, roll down their window, and engage with the leafleteers. However, many choose not to do so. Thus, when balancing FPR's right to communicate its message against the rights of patients and others not to engage, it is clear that there is no substantial burden on FPR's ability to leaflet.

Moreover, the fact that FPR has alternative channels of communication available further demonstrates why the Ordinance is constitutional. As the district court found, the remaining portions of the driveway and adjacent sidewalk area are still available. *See Daniel v. City of Tampa*, 38 F.3d 546, 550 (11th Cir. 1994) (involving a nonpublic forum, but recognizing alternative means existed when protestor still had unlimited access to other parts of street and sidewalk adjacent to restricted area); *Nationalist Movement v. City of Cumming, Georgia,* 92 F.3d 1135, 1140 (11th Cir. 1996) (upholding city ordinance that restricted nationalist organization from protesting near courthouse given multiple dates, times, and locations where they could hold demonstrations). The record shows FPR "can still express [its] message" in the exact manner that it prefers

to, but it "must [merely] stand more than [five] feet from the [c]linic." *Lucero*, 121 F.3d at 605.

### III.     FPR Did Not Satisfy the Other Requisites of a Preliminary Injunction

Finally, FPR has not shown irreparable harm, that the balance of harms weighs in its favor, or that granting the stay is in the public's best interest. "[T]he irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Siegel*, 234 F.3d at 1177 (quoting *N.E. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 896 F.2d 1283, 1285 (11th Cir. 1990)). FPR has not proven it suffered irreparable harm, especially given the available means of communicating its message, or that any harm is more weighty than the disturbances, confrontations, and other harms the City documented for over a year. The City, on the other hand, has shown the preliminary injunction serves the public interest by increasing vehicular safety at the clinic for all people there. *Id.*

For the reasons stated, FPR has not established any of the necessary elements in support of its motion for a preliminary injunction, and the district court's decision should be affirmed.